Filed:  September 17, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

---

Nos. 93-5899(L)
(CR-93-13)

---

United States of America,

Plaintiff - Appellee,

versus

Frank Kahled Burgos, et al,

Defendants - Appellants.

---

O R D E R

---

The Court amends its opinion filed August 23, 1996, as follows:

On page 2 of Volume 1 and page 40 of Volume 2, section 1, line 3 -- "Widener," is added after Judge Russell and before Judge Wilkins.

On page 2 of Volume 1 and page 40 of Volume 2, section 1 -- line 4, referring to Judge Widener's concurring opinion, is deleted.

On pages 49-50 of Volume 2 -- Judge Widener's concurring opinion is deleted.

On page 50 of Volume 2 -- footnotes 1 and 2 are deleted.

For the Court - By Direction


/s/ Patricia S. Connor
_____
Acting Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                  No. 93-5899

FRANK KAHLED BURGOS,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                                  No. 93-5919

ALEXIO BURNARD GOBERN,
Defendant-Appellant.

Appeals from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., and William L. Osteen, Sr.,
District Judges.
(CR-93-13)

Argued: September 26, 1995

Decided: August 23, 1996

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges.

_____

Affirmed in part and dismissed in part by published opinion. Judge Williams wrote the majority opinion, in which Chief Judge Wilkinson and Judges Russell, Widener, Wilkins, Niemeyer, Hamilton, and Luttig joined. Judge Michael wrote an opinion concurring in part and dissenting in part, in which Judges Hall, Murnaghan, Ervin, and Motz joined.

_____

**COUNSEL**

**ARGUED:** Thomas Norman Cochran, Assistant Federal Public Defender, Greensboro, North Carolina, for Appellant Burgos; Joseph R. Giaramita, Jr., Brooklyn, New York, for Appellant Gobern. Michael Francis Joseph, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Todd M. Peebles, PEEBLES & SCHRAMM, Winston-Salem, North Carolina, for Appellant Gobern. Walter C. Holton, United States Attorney, Greensboro, North Carolina, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

In these consolidated appeals, Frank Burgos and Alexio Gobern appeal their convictions for conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C.A. §§ 841(a)(1) and 846 (West 1981 & Supp. 1996), contending that the evidence was insufficient to sustain their convictions. Additionally, Burgos appeals his conviction for possession with intent to distribute cocaine base and aiding and abetting that crime, in violation of 18 U.S.C.A. § 2 (West 1969) and 21 U.S.C.A. § 841(a)(1), again challenging the sufficiency of the evidence to support his conviction.

Gobern also appeals his sentence on two grounds. First, he asserts that the district court erred in failing to depart downward based on an isolated act of aberrant behavior, pursuant to United States Sentencing Commission, Guidelines Manual, Chapter 1, Part A, 4(d) (1992). Second, describing himself as a "person of color," Gobern posits that his

2

sentence violates the Equal Protection Clause because offenses involving cocaine base are more severely punished than offenses involving cocaine powder, and since "persons of color" are more frequently convicted of cocaine base offenses, they are disproportionately punished.

We consolidated Burgos's and Gobern's appeals and elected to hear them en banc. We take this opportunity to clarify the law of this circuit respecting challenges to the sufficiency of the evidence in connection with conspiracy convictions, and in so doing, we affirm the convictions of Burgos and Gobern. In affirming the convictions, we honor two bedrock principles of Anglo-American jurisprudence: the Government must prove each element of a crime beyond a reasonable doubt, and the jury determines whether the Government has satisfied this evidentiary burden. Our review is limited to determining whether substantial evidence supports the conviction. In addressing Gobern's challenges to his sentence, we also honor entrenched principles of this court's jurisprudence: a deliberate refusal by the district court to depart downward is not appealable; and sentencing disparities between offenses involving cocaine base and cocaine powder do not deny equal protection of the law. Thus, respecting Gobern's appeal from his sentence, we dismiss in part and affirm in part.

First, we shall recite the facts adduced at the separate trials of Burgos and Gobern. Second, we shall address Burgos's and Gobern's conspiracy convictions and whether the evidence was sufficient to sustain them. Third, we shall address Burgos's challenge to his possession and aiding and abetting conviction and whether the evidence was sufficient to support it. Finally, we shall address Gobern's challenges to his sentence.

I.

Taken in the light most favorable to the Government, see Evans v. United States, 504 U.S. 255, 257 (1992), the evidence adduced at Burgos's trial established the following facts. On January 25, 1993, law enforcement officers Berkley Blanks and Daniel Kaplan were performing narcotics interdiction at the train station in Greensboro, North Carolina, focusing on a train arriving from New York, New York, a known source city for contraband narcotics. Officers Blanks

3

and Kaplan observed Burgos, Gobern, and Anthony Gonzales disembark together from the train, but walk separately into the terminal. Officer Blanks testified that he initiated a conversation with Gonzales, who informed Officer Blanks he was traveling alone from New York, denied familiarity with Gobern, and presented a train ticket bearing the name "Anthony Flores." Officer Kaplan testified that he spoke with Burgos, who produced a train ticket bearing his own name. According to Officer Blanks, Gobern carried a knapsack and a package wrapped in Christmas paper but which bore no ribbon, bow, or card; also, Gobern carefully observed Officer Blanks's conversation with Gonzales.

As Officer Blanks and Gonzales walked to the front of the terminal, Gobern followed them, continued to observe them, halted when Officer Blanks and Gonzales halted, and with the Christmas package and knapsack, proceeded into the terminal lavatory, where he remained one to two minutes; this lavatory was small, measuring 9.5 feet square. Gobern then exited the lavatory without the Christmas package, but still carrying the knapsack. Officers Blanks and Kaplan testified unequivocally that no one else entered, occupied, or exited the lavatory while Gobern occupied it. On exiting the lavatory, Gobern, at Officer Kaplan's request, produced his train ticket, which, like Gonzales's ticket, bore the name "Anthony Flores," stated that he was traveling alone from New York, and denied that he and Gonzales knew each other. Interestingly, Gonzales's and Gobern's train tickets bore consecutive numbers, were purchased simultaneously at the same locale, and were both round-trip tickets from New York, New York, to Greensboro, North Carolina, issued on January 25, 1993, with a return date of January 27, 1993.

After concluding their conversation with Gobern, Officers Blanks and Kaplan proceeded immediately to the lavatory just exited by Gobern while Officer Cameron Piner, who had recently arrived at the train terminal, watched Burgos, Gobern, and Gonzales. On the sink, Officers Blanks and Kaplan found the Christmas package and a cereal box, both of which were ripped open, and crumpled newsprint dated January 9, 1993 from The Daily News, a New York newspaper. Pages from the same edition of The Daily News were found on the floor and in the wastebasket of the lavatory. Also in the wastebasket were pieces of the Christmas paper in which the Christmas package had

4

been wrapped, as well as remnants of the package itself. Secreted behind the commode was a mass of wadded newsprint, which concealed aluminum foil, which, in turn, concealed a plastic bag containing 78.5 grams of cocaine base, an amount which Officers Blanks and Kaplan testified was a distribution quantity. Significantly, the newspaper concealing the foil and plastic bag was from the same edition of The Daily News that was on the sink, scattered around the floor, and in the wastebasket. Not only was this wadded mass of newsprint from The Daily News, but it complemented and completed perfectly the newspaper edition found near the sink. Officers Blanks and Kaplan exited the lavatory, and Officer Blanks observed Burgos, Gobern, and Gonzales attempt to board the same taxicab. Before they could depart, Gobern was arrested, and Burgos and Gonzales agreed to accompany Officers Blanks and Kaplan for questioning. Burgos was then questioned by Special Agent Wayne Kowalski of the Drug Enforcement Agency.

At Burgos's trial, Special Agent Kowalski testified that Burgos stated: (1) he knew Gonzales, but not Gobern; (2) he conversed with Gonzales and Gobern on the train; (3) he knew that cocaine base was in the Christmas package, which Gobern possessed since leaving New York; and (4) he knew that the cocaine base was to be distributed at a college in Greensboro, North Carolina. Specifically, Special Agent Kowalski avowed that Burgos admitted that "Gobern. . . carried the package wrapped as a Christmas package . . . throughout the trip down." (J.A. at 67.) (emphasis added). Moreover, "Burgos . . . knew that they had dope. . . . [I]t was his understanding they were going to sell the dope at the A&T University." (J.A. at 67.) Dispelling any doubt that Burgos knew that the plastic bag containing the cocaine base was in the Christmas package since the trio left New York, Special Agent Kowalski testified that he asked Burgos "whether he knew that there was crack cocaine in the package" and Burgos "said that he knew they had it, but he didn't see it." (J.A. at 66-67.) Additionally, Special Agent Kowalski testified that Burgos stated that he was in Greensboro visiting a friend, but did not mention traveling to Laurinburg, North Carolina, to play basketball with his former schoolmates, as Burgos testified at trial; indeed, the train on which the men traveled did not stop at Laurinburg. Also introduced at Burgos's trial was forensic evidence revealing that Gobern's fingerprints were on the Christmas wrapping paper, and that Burgos's fingerprint was im-

5

pressed on the sealing mechanism at the top of the plastic bag which contained the cocaine base, although forensic analysis did not establish when Burgos's fingerprint was impressed on the plastic bag.

Burgos's testimony differed dramatically from Special Agent Kowalski's. Burgos testified that while purchasing his train ticket, Gonzales, whom Burgos knew only by the alias "Tone," requested that Burgos purchase two train tickets for him and gave Burgos a piece of paper with a reservation number and the name "Flores" written on it. Burgos and Gonzales also exchanged telephone numbers. Burgos purchased three round-trip train tickets: One for himself in his own name and the other two for Gonzales in the name of "Anthony Flores," the two for Gonzales each having a two-day stay in Greensboro and returning to New York City on January 27, 1993. Burgos testified further that Gonzales was alone when he solicited Burgos to purchase his train tickets. According to Burgos, he then boarded the train by himself. While on board, he was approached by Gonzales, Gobern, whom Burgos denied knowing, and two women, who have remained nameless and faceless, all of whom sat behind Burgos. Testifying further, Burgos stated that he carried with him on the train sandwiches, cookies, and potato chips, all of which were wrapped in plastic bags similar to the plastic bag bearing his fingerprint in which the cocaine base was found. Burgos, however, did not consume all of the food he brought, but rather shared it with Gonzales, Gobern, and the women. Specifically, he gave sandwiches, still encased in the plastic bags, to Gonzales and Gobern and gave the cookies to the women.

Moreover, Burgos avowed that he had no discussions with Gonzales and Gobern concerning narcotics while on the train. Regarding his intentions in North Carolina, Burgos testified that after visiting friends for one day in Greensboro, he intended to play basketball with former schoolmates in Laurinburg. With respect to the Christmas package, Burgos testified that Gobern carried no such Christmas package, yet on cross-examination he testified that Gobern wrapped no packages on the train nor did Gobern possess any implements used to wrap packages, such as paper, tape, or scissors. Likewise, on cross-examination, Burgos could offer no explanation for his fingerprint on the plastic bag containing the cocaine base, nor could Burgos explain the glaring, direct contradictions between his testimony and that of Special Agent Kowalski.

6

Other testimony in Burgos's trial was in a like vein, namely that Burgos's testimony diverged markedly from that of law enforcement agents. For instance, Burgos initially testified that he preceded Gobern in exiting the train, but then recanted and stated that Gobern disembarked before him. Burgos also testified that Officer Blanks cursed and brandished a firearm at him, but Officer Blanks denied even speaking to Burgos, let alone using profanity or displaying a firearm. Additionally, Burgos avowed that he appeared at arraignment without counsel, but subsequently repudiated this statement and testified that counsel was indeed present with him at arraignment. The record is rife with examples of Burgos's vague, equivocal, and contradictory responses.

Burgos was convicted of conspiracy to possess with intent to distribute cocaine base, in violation of 21 U.S.C.A. §§ 841(a)(1), 846, possession with intent to distribute cocaine base, in violation of 18 U.S.C.A. § 2 and 21 U.S.C.A. § 841(a)(1), and aiding and abetting, and sentenced to 131 months imprisonment. Burgos appeals his convictions, challenging the sufficiency of the evidence, but he does not appeal his sentence.

II.

We now consider the evidence adduced at Gobern's trial. Although Gobern was tried and convicted prior to Burgos's arraignment, the evidence adduced at Gobern's trial was substantially similar to the evidence adduced at Burgos's later trial, but differed in some respects. For example, Special Agent Kowalski did not testify at Gobern's trial that Burgos stated he knew Gonzales, Burgos traveled with Gobern and Gonzales aboard the train, Gobern carried the Christmas package from New York City, and Burgos knew that cocaine base, slated for distribution in Greensboro, was in the package. Also at Gobern's trial, there was no evidence respecting when Burgos's fingerprint was impressed on the plastic bag, and Burgos did not testify at Gobern's trial that he brought food with him on the train trip from New York City.

At Gobern's trial, Officers Blanks and Kaplan testified that, in connection with performing their duty of narcotics interdiction at the Greensboro train station, they witnessed Burgos, Gobern, and Gon-

7

zales disembark in tandem from a train arriving from New York City, a known source city for contraband narcotics, and enter the terminal separately. Officer Blanks testified that he approached Gonzales, who identified himself as "Anthony Gonzales," but produced a train ticket bearing the name "Anthony Flores." While Officer Blanks was questioning Gonzales, Officer Kaplan questioned Burgos. According to Officers Blanks and Kaplan, Gobern surveyed Officer Blanks's conversation with Gonzales with interest. Also, Officers Blanks and Kaplan testified that as they accompanied Burgos and Gonzales to the terminal, they occasionally discontinued walking and stopped to talk to Burgos and Gonzales, and Gobern simultaneously discontinued and resumed walking.

Officers Blanks and Kaplan also testified that Gobern carried a Christmas package wrapped with red-and-green-striped paper and a knapsack. Testifying further, Officers Blanks and Kaplan related that Gobern proceeded directly into the small lavatory at the train station with the Christmas package and the knapsack, but that on exiting the lavatory, Gobern conspicuously was not carrying the Christmas package. As Gobern exited the lavatory, Officer Blanks requested that Gobern produce his train ticket, which also bore the name "Anthony Flores." According to Officer Kaplan, Gonzales's and Gobern's tickets were sequentially numbered, purchased at the same locale on the same date, and had identical destinations and durations, namely that the tickets were purchased in New York, were for a two-day trip arriving in Greensboro on January 25, 1993 and returning to New York City on January 27, 1993. Officer Blanks avowed that Gobern informed him that he was traveling alone and denied knowing Gonzales. While speaking with Officers Blanks and Kaplan, Gobern exhibited nervous behavior; for instance, his hands shook and he avoided eye contact.

On inspecting the lavatory after conversing with Gobern, Officers Blanks and Kaplan found the cleaved Christmas package and a torn cereal box on the sink. Used as packing material in connection with the Christmas package and cereal box were pages of The Daily News, a New York newspaper. Pages from the same edition of The Daily News were in the cereal box, the wastebasket, and littered about the ripped Christmas package. As Officers Blanks and Kaplan inspected the lavatory further, behind the commode they found a plastic bag

8

containing 78.5 grams of cocaine base that was concealed in aluminum foil, which was surrounded by wadded pages from the same edition of The Daily News as that found elsewhere. Gobern's fingerprints were recovered from the red-and-green-striped wrapping paper on the Christmas package, and Burgos's fingerprint was recovered from the plastic bag containing the 78.5 grams of cocaine. Special Agent Kowalski testified that forensic analysis proved that Burgos's fingerprint was on the plastic bag. Officers Blanks and Kaplan were adamant that no one else entered, occupied, or departed the lavatory while Gobern was in it. Officer Blanks stated that, on exiting the lavatory, he witnessed Burgos, Gobern, and Gonzales attempt to board the same taxicab.

Gobern was convicted of conspiracy to possess with intent to distribute cocaine base and possession with intent to distribute cocaine base. Violations of § 841(a)(1) involving more than fifty grams of cocaine base provide for a statutory mandatory minimum prison sentence of ten years. See 21 U.S.C.A. § 841(b)(1)(A) (West Supp. 1995). Under the Sentencing Guidelines, Gobern's total offense level of thirty-two, combined with a criminal history category of one, resulted in a guideline range of 121 to 151 months imprisonment, with his convictions consolidated for purposes of entry of judgment. The district court sentenced Gobern to 121 months imprisonment.

Gobern appeals his conspiracy conviction and his sentence. Regarding his conviction, Gobern asserts that the evidence was insufficient to support it. With respect to his sentence, Gobern raises two challenges. First, he posits that the district court erred in failing to depart downward based on aberrant behavior. The gravamen of his position is that Gobern had no prior involvement with drug trafficking offenses and his involvement in the crimes for which he was convicted was an anomaly not in keeping with his character. Second, although he failed to raise the issue in the district court, Gobern, who describes himself as a "person of color," maintains on appeal that the statutory mandatory minimum sentence under 21 U.S.C.A. § 841(b)(1)(A) (West Supp. 1995) violates the Equal Protection Clause. According to Gobern, meting out greater punishments for offenses involving cocaine base than for offenses involving equal amounts of cocaine powder denies "persons of color" equal protection of the law because they are more frequently convicted of offenses involving

9

cocaine base, while Caucasians are more frequently convicted of violations involving cocaine powder.

III.

Burgos and Gobern challenge the sufficiency of the evidence to support their conspiracy convictions. Construing all of the evidence and the inferences to be drawn therefrom in the light most favorable to the Government, we conclude that a rational jury could find that the evidence was sufficient to sustain their conspiracy convictions.

A.

1.

To prove conspiracy to possess cocaine base with intent to distribute, the Government must establish that: (1) an agreement to possess cocaine with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of this conspiracy. See United States v. Collazo, 732 F.2d 1200, 1205 (4th Cir. 1984), cert. denied, 469 U.S. 1105 (1985). In United States v. Laughman, 618 F.2d 1067, 1074 (4th Cir.), cert. denied, 447 U.S. 925 (1980), we explained that the "gravamen of the crime of conspiracy is an agreement to effectuate a criminal act." By its very nature, a conspiracy is clandestine and covert, thereby frequently resulting in little direct evidence of such an agreement. See Blumenthal v. United States, 332 U.S. 539, 557 (1947); United States v. Wilson, 721 F.2d 967, 973 (4th Cir. 1983). Hence, a conspiracy generally is proved by circumstantial evidence and the context in which the circumstantial evidence is adduced. See Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975); United States v. Dozie, 27 F.3d 95, 97 (4th Cir. 1994) (per curiam); United States v. Andrews, 953 F.2d 1312, 1318 (11th Cir.), cert. denied, 505 U.S. 1210 (1992). Indeed, a conspiracy may be proved wholly by circumstantial evidence. See Iannelli, 420 U.S. at 777 n.10; United States v. Durrive, 902 F.2d 1221, 1229 (7th Cir. 1990); Laughman, 618 F.2d at 1074. Circumstantial evidence tending to prove a conspiracy may consist of a defendant's "relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy."

10

Collazo, 732 F.2d at 1205. A conspiracy, therefore, "may be inferred from a `development and collocation of circumstances'." Glasser v. United States, 315 U.S. 60, 80 (1942) (quoting United States v. Manton, 107 F.2d 834, 839 (2d Cir. 1939), cert. denied, 309 U.S. 664 (1940)). Circumstantial evidence sufficient to support a conspiracy conviction need not exclude every reasonable hypothesis of innocence, provided the summation of the evidence permits a conclusion of guilt beyond a reasonable doubt. See Holland v. United States, 348 U.S. 121, 139-40 (1954). While circumstantial evidence may sufficiently support a conspiracy conviction, the Government nevertheless must establish proof of each element of a conspiracy beyond a reasonable doubt. See Glasser, 315 U.S. at 80. To require less of the Government would eviscerate its burden to prove all elements of a crime beyond a reasonable doubt and relieve it of its burden of vigilance in prosecuting crimes -- thereby violating bedrock principles of our Anglo-American jurisprudence. See In re Winship, 397 U.S. 358 (1970).

The preceding precepts demonstrate that a conspiracy can have an elusive quality and that a defendant may be convicted of conspiracy with little or no knowledge of the entire breadth of the criminal enterprise:

> It is of course elementary that one may be a member of a conspiracy without knowing its full scope, or all its members, and without taking part in the full range of its activities or over the whole period of its existence. Critically, it is not necessary to proof of a conspiracy that it have a discrete, identifiable organizational structure; the requisite agreement to act in concert need not result in any such formal structure[.] [I]ndeed[,] . . . contemporary drug conspiracies[ can] contemplate[ ] . . . only a loosely-knit association of members linked only by their mutual interest in sustaining the overall enterprise of catering to the ultimate demands of a particular drug consumption market . . . .

United States v. Banks, 10 F.3d 1044, 1054 (4th Cir. 1993), cert. denied, 114 S. Ct. 1850 (1994). Thus, while many conspiracies are executed with precision, the fact that a conspiracy is loosely-knit,

11

haphazard, or ill-conceived does not render it any less a conspiracy -- or any less unlawful.

Of course, in addition to proving the existence of a conspiracy beyond a reasonable doubt, the Government must also prove a defendant's connection to the conspiracy beyond a reasonable doubt. To satisfy that burden, the Government need not prove that the defendant knew the particulars of the conspiracy or all of his coconspirators. See Blumenthal, 332 U.S. at 557; United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.), cert. denied, 505 U.S. 1228 (1992). Indeed, a defendant properly may be convicted of conspiracy

> without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and willfully joins in the plan on one occasion, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part.

United States v. Roberts, 881 F.2d 95, 101 (4th Cir. 1989); see also United States v. Mezzanatto, 115 S. Ct. 797, 805 (1995) (recognizing that there are "big fish" and "small fish" in conspiracies). Like the conspirators' agreement, a defendant's participation in the conspiracy "need not be explicit; it may be inferred from circumstantial evidence." United States v. Prince, 883 F.2d 953, 957 (11th Cir. 1989). In addition to selling narcotics, that participation may assume a myriad of other forms, such as supplying firearms or purchasing money orders for coconspirators or permitting them to store narcotics and other contraband in one's home, see United States v. James, 40 F.3d 850, 873 (7th Cir. 1994), modified on remand on other grounds, 79 F.3d 553 (7th Cir. 1996); or purchasing plane tickets for coconspirators, see United States v. Sanchez, 961 F.2d 1169, 1178 (5th Cir.), cert. denied 506 U.S. 918 (1992). Thus, a variety of conduct, apart from selling narcotics, can constitute participation in a conspiracy sufficient to sustain a conviction.

Regrettably, some of our jurisprudence can be read as lacking uniform application with respect to principles of conspiracy law. For instance, United States v. Giunta, 925 F.2d 758 (4th Cir. 1991), may be read as demanding a heightened degree of review regarding suffi-

12

ciency challenges to conspiracy convictions. Giunta, like the dissent, premised its reasoning on Justice Jackson's concurring opinion in Krulewitch v. United States, 336 U.S. 440 (1949), in which a single justice expressed reserve that perhaps the Government indicted for conspiracy rather than the substantive offense because securing a conspiracy conviction was putatively easier. See Giunta, 925 F.2d at 765. In expounding on Justice Jackson's reservation, the Giunta court observed that a conspiracy charge was a "`potent and oft-used weapon in the prosecutorial arsenal,' particularly in connection with the drug trafficking prosecutions that increasingly dominate federal criminal dockets." Giunta, 925 F.2d at 766 (quoting United States v. Caro, 569 F.2d 411, 418 (5th Cir. 1978) (Goldberg, J.)). In this connection, Giunta suggested that affirming a conspiracy conviction could act as an obfuscation lending credence to "`slippery facts and the speculations necessary to uphold [the conspiracy] conviction.'" id. (quoting Caro, 569 F.2d at 418) (alteration in original), often resulting in "special risks of unfairness," id. Given Giunta's skepticism regarding conspiracy, the court announced that "[h]eightened vigilance to guard against the increased risks of speculation, though not a heightened standard, is warranted in conspiracy prosecutions." Id. Given this "heightened vigilance," Giunta focused its review not on the circumstantial evidence tending to prove a conspiracy, but rather on the "specific weaknesses" in the evidentiary picture. Id. In reversing Giunta's convictions, the court concluded that the Government's case failed for want of "evidence about conduct independent" of the circumstantial evidence surrounding the criminal activity. Id. at 765.

Giunta's unilateral pronouncements, especially its application of "heightened vigilance" to reverse a conviction, cannot be squared with the aforementioned precepts of conspiracy law. First, we note that Krulewitch was a concurring opinion that reflected the thoughts of a single Justice, whom the Court subsequently described as "no friend of the law of conspiracy," Iannelli, 420 U.S. at 778. Second, we do not share Justice Jackson's, Giunta's, or the dissent's skepticism that conspiracy is a Frankenstein's monster that has grown out of control. In this respect, Justice Jackson's, Giunta's, and the dissent's dire prognostication that the Government would indict for conspiracy in lieu of the substantive offense has not materialized because the Government typically indicts for both offenses, not exclusively for the conspiracy offense. For example, Burgos was indicted for posses-

13

sion with intent to distribute cocaine base and aiding and abetting, as well as conspiracy with intent to possess with intent to distribute cocaine base. Third, Giunta's invitation to exercise "heightened vigilance" by focusing on the "specific weaknesses" in the evidence appears at loggerheads with the principles that in reviewing a conspiracy conviction, we accept the facts in the light most favorable to the Government and consider the circumstances and the context in which the circumstantial evidence is adduced, bearing in mind that a conspiracy can be proved wholly by circumstantial evidence.

The dissent erroneously contends that Giunta did not create or apply a heightened standard for reviewing conspiracy convictions. See post at 60-64 & n.3. Rather, it conclusorily asserts in a block quote that Giunta is consistent with conspiracy law. Giunta, however, expressly created the improvident "heightened vigilance" language -- the phrase does not appear in our jurisprudence prior to Giunta -- and vigorously applied it to reverse Giunta's conviction. Perpetuating the same error, the dissent candidly substitutes its "`raw judgment call,'" see post at 64 n.4, for the jury's determination of guilt. An appellate court, however, may not substitute a "`raw judgment call'" in reviewing sufficiency challenges; our task is to determine if substantial evidence, viewed most favorably to the Government, supports the conviction beyond a reasonable doubt. Because of Giunta's substitution of "`a raw judgment call'" for the jury's verdict, reliance on the Krulewitch concurrence, rather than binding precedent, its reference to "heightened vigilance," and its focus on "specific weaknesses," rather than the totality of the circumstances in assessing the evidence, Giunta is not consistent with our conspiracy jurisprudence.**1**

_____

**1** The dissent's protestation notwithstanding, see post at 61-62 n.3 and 63-64, the fact that our Court has cited Giunta is not phenomenal because we have merely cited it for unchallenged precepts of conspiracy law. See, e.g., United States v. Heater, 63 F.3d 311, 323 (4th Cir. 1995) (relying on Giunta for the elements of a conspiracy and the propositions that we must take the facts in the light most favorable to the Government in reviewing convictions and that a conspiracy can be proved by circumstantial evidence); United States v. Johnson, 54 F.3d 1150, 1153 (4th Cir.) (citing Giunta for the proposition that we must view the facts in the light most favorable to the Government in reviewing a conviction), cert. denied, 116 S. Ct. 266 (1995); United States v. Harris, 39 F.3d 1262,

14

Likewise, United States v. Bell, 954 F.2d 232 (4th Cir. 1992), cannot be squared with these tenets of conspiracy law. According to Bell, "[a] conspiracy is not shown until the government has presented evidence of a specific agreement to commit a specific crime, for the same criminal purposes, on the part of all indicted conspirators." Id. at 237-38. While the dissent cites Bell and Giunta for this proposition as "the black letter law of conspiracy," post at 59, we are not persuaded this proposition represents black letter conspiracy law. Rather, black letter conspiracy law requires the Government to prove:

> (1) an agreement between two or more persons, which constitutes the act; and (2) an intent thereby to achieve a certain objective which, under the common law definition, is the doing of either an unlawful act or a lawful act by unlawful means.

Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law Ch. 6, § 6.4, at 525 (2d ed. 1986). In this regard, "[c]onspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act[, and t]he agreement need not be shown to have been explicit." Iannelli, 420 U.S. at 777 & n.10;**2** see also United States v. Morsley,

_____

1267 (4th Cir. 1994) (relying on Giunta for the proposition that a conspiracy may be proved by circumstantial evidence); United States v. Kennedy, 32 F.3d 876, 886 (4th Cir. 1994) (citing Giunta for the precept that we must accept the facts favorably to the Government in reviewing a conspiracy conviction), cert. denied, 115 S. Ct. 939 (1995). We have not, however, followed or endorsed Giunta's "heightened vigilance," "specific weaknesses" or "`raw judgment call'" language, and tellingly so, the dissent cites no cases in which such incorrect language has been embraced. Moreover, because in this Circuit we observe the rule of inter-panel accord, see Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1989) (en banc), a subsequent panel could not overrule Giunta -- a feat that requires the en banc Court. As we are now so convened to analyze tenets of conspiracy law, we take this opportunity to do so.

**2** The dissent posits that we have mistakenly cited Iannelli for the proposition that a conspiracy need not be specific, but this is incorrect. Precisely, we have quoted Iannelli as stating that a conspiracy need not be explicit respecting its objectives because the gist of a conspiracy is the

15

64 F.3d 907, 919 (4th Cir. 1995) (holding that there need not be evidence of a specific agreement in order to sustain a conspiracy conviction), cert. denied, 116 S. Ct. 749 (1996). Because we believe that these precepts set the proper contours of conspiracy law, setting parameters regarding specificity of the agreement is difficult to harmonize with the elastic, ad hoc principles that shape our conspiracy jurisprudence.**3**

Moreover, our precedents have mandated that "[o]nce it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction." Brooks, 957 F.2d at 1147; see also United States v. Seni, 662 F.2d 277, 285 n.7 (4th Cir. 1981), cert. denied, 455 U.S. 950 (1982). We have adhered repeatedly to this principle, explaining that

_____

agreement to commit an unlawful act. Given that a conspiracy is generally a covert operation, it is often short on explicit information. As such, a conspiracy is often "inferred from the facts and circumstances of the case." Iannelli, 420 U.S. at 777-78 n.10. The dissent misperceives the difference between conspiracy to commit the crime and the activity that can constitute participation in the conspiracy: the former requires a violation of a specific law, while the latter is evidenced by the activity to further the conspiracy.

**3** The dissent erroneously suggests that we have confused the elements of the crime of conspiracy with an evidentiary sufficiency challenge. See post at 58. The dissent states we have characterized conspiracy jurisprudence as "a collection of `elastic, ad hoc principles.'" Post at 58 & 59. This is a facile suggestion because we have taken great pains to articulate the tenets of conspiracy jurisprudence. In making this suggestion, the dissent takes out of context the precept that a conspiracy need not be evidenced by specific acts; therefore, attempting to prescribe specific acts that constitute participation in a conspiracy "is difficult to harmonize with the elastic, ad hoc principles that shape our conspiracy jurisprudence." Thus, we simply concluded that prescribing specific conduct as demonstrating participation in a conspiracy was at odds with the precept that a conspiracy need not "have a discrete, identifiable organizational structure," but can be "loosely-knit." Banks, 10 F.3d at 1054. We have not, therefore, created from whole cloth a "sweeping statement" that our conspiracy law has been reduced to a mere "collection of `elastic, ad hoc principles.'" Post at 58.

16

while the existence of the conspiracy and the defendant's connection to it must be proved beyond a reasonable doubt, the defendant's connection to the conspiracy need only be "slight." See, e.g., United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995); Dozie, 27 F.3d at 97; United States v. Whittington, 26 F.3d 456, 465 (4th Cir. 1994); United States v. Chorman, 910 F.2d 102, 109 (4th Cir. 1990); Laughman, 618 F.2d at 1076. Requiring that the defendant's connection to the conspiracy be "slight" in no way alleviates the Government's burden of proving the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt. The term "slight" does not describe the quantum of evidence that the Government must elicit in order to establish the conspiracy, but rather the connection that the defendant maintains with the conspiracy. Requiring a "slight connection" between the defendant and the established conspiracy complements the canons of conspiracy law that a defendant need not know all of his coconspirators, comprehend the reach of the conspiracy, participate in all the enterprises of the conspiracy, or have joined the conspiracy from its inception.

Again, regrettably, some of our jurisprudence is confused between the burden of proof the Government must meet to prove the defendant's connection to the conspiracy and the degree of connection the Government must show to establish the defendant as a member of the conspiracy. For instance, in United States v. Truglio, 731 F.2d 1123, 1133 (4th Cir.), cert. denied, 469 U.S. 862 (1984), we stated that after establishing the existence of the conspiracy, in order to convict the defendant, the Government need only show "slight evidence" connecting the defendant to the conspiracy. This is a misstatement of the law: as we now explain, the Government must prove the existence of the conspiracy and the defendant's connection to it beyond a reasonable doubt, which is the standard the Supreme Court has employed consistently, see, e.g., Glasser, 315 U.S. at 80; but a defendant's connection to the conspiracy merely need be "slight." Sustaining a conviction based on "slight evidence" is contrary to the Government's obligation to prove crimes beyond a reasonable doubt.

Likewise, Bell can be read as increasing the quantitative connection required to tie a defendant to a conspiracy. While the Bell court concluded that Bell and Cruz were properly convicted of possession with intent to distribute narcotics, see Bell, 954 F.2d at 235, it reversed

17

their conspiracy convictions because "[t]he evidence of the connections" was insufficient to demonstrate a "specific agreement to commit wrongful acts," id. at 238. In our view, because Bell demanded a specificity requirement, it can be read as implying that a substantial, not slight, connection is necessary to tie a defendant to a conspiracy. We disagree, therefore, with the dissent's characterization that Bell cannot be construed as confusing the law respecting the slight connection rule, see post at 59, 61, 64-65.

Thus, Truglio sustained conspiracy convictions based on "slight evidence," while Bell can be read as implying that the Government must not only prove the existence of the conspiracy beyond a reasonable doubt, but also that the defendant's connection to the conspiracy be substantial, not slight. We cannot subscribe to either polarized view, finding each incorrectly extreme in its application of conspiracy law. Accordingly, we restore symmetry and consistency to our law respecting the distinction between proving the existence of a conspiracy and establishing a defendant's connection to it. Fidelity to the Constitution directs us to hold that the Government must prove the existence of a conspiracy beyond a reasonable doubt, but upon establishing the conspiracy, only a slight connection need be made linking a defendant to the conspiracy to support a conspiracy conviction, although this connection also must be proved beyond a reasonable doubt. We dispel any other formulation of this precept from the Fourth Circuit, and to the extent any decisions -- and in particular, Bell, Giunta, and Truglio -- are inconsistent with this dictate, we expressly overrule them.**4**

_____

**4** One of the dissent's pervasive, fatal flaws is its failure to recognize that our duty is to review facts and law, not to engage in raw decisionmaking, which is the task of the finder of fact. Succinctly stated, the dissent fails to understand the distinction between review and substitution. Repeatedly, the dissent narrowly focuses on reviewing selected pieces of evidence in reviewing the total circumstances establishing guilt, see post at 60 ("I will mention just a few examples [of the facts establishing guilt]."); 66 ("I think it clear, [despite the evidence of guilt] that the Government failed to present substantial evidence that Burgos knowingly and wilfully participated [in the conspiracy]."); 67-68 (stating facts that the dissent would have found persuasive in finding guilt); 70 ("[C]ould a reasonable juror still infer . . . that Burgos must have assisted in the

18

2.

We now turn to our standard of review. In Glasser, the Supreme Court explained that a jury verdict "must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser, 315 U.S. at 80 (emphasis added). A reviewing court, therefore, may not overturn a substantially supported verdict merely because it finds the verdict unpalatable or determines that another, reasonable verdict would be preferable. Rather, we shall reverse a verdict if the record demonstrates a lack of evidence from which a jury could find guilt beyond a reasonable doubt. See United States v. Lowe, 65 F.3d 1137, 1142 (4th Cir. 1995), petition for cert. filed, 64 U.S.L.W. 3709 (U.S. Feb. 22, 1996) (No. 95-1659). In explaining the circumscribed scope of our review, the Supreme Court explained in Burks v. United States, 437 U.S. 1, 17 (1978), that "appellate reversal on grounds of insufficient evidence . . . will be confined to cases where the prosecution's failure is clear." Thus, in the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt. See United States v. Smith, 29 F.3d 914, 917 (4th Cir.), cert. denied, 115 S. Ct. 454 (1994). In applying this standard of review, we must remain cognizant of the fact that "[t]he jury, not the reviewing court, weighs the credibility of the evidence and resolves any conflicts in the evidence presented, and if the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." United States v. Murphy, 35 F.3d 143, 148 (4th Cir. 1994) (citations omitted), cert. denied, 115 S. Ct. 954 (1995). Deferring to the jury's findings, an "appellate court . . . must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold it." Burks, 437 U.S. at 17. Likewise, determinations of credibility "are within the sole province of the jury and

_____

packaging of the cocaine [base] prior to boarding the train in New York? I think not."); 74 ("Could then the association evidence and the fingerprint evidence . . . lead a juror rationally to conclude . . . that Burgos willfully participated in [the conspiracy]? Again, I think not."), but that is immaterial. As an appellate court, our function is to review for error, not to substitute our judgment for that of the jury.

19

are not susceptible to judicial review." <u>Lowe</u>, 65 F.3d at 1142; <u>see also Glasser</u>, 315 U.S. at 80. Thus, the appellate function is not to determine whether the reviewing court is convinced of guilt beyond reasonable doubt, but, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government, "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." <u>United States v. Powell</u>, 469 U.S. 57, 67 (1984).**5** The focus of our review, therefore, is whether:

> The Government . . . [has] satisf[ied] the courts that given [its] proof the jury could rationally have reached a verdict of guilty beyond a reasonable doubt. We do not believe that further safeguards against jury irrationality are necessary.

<u>Id.</u>

Critical to our review of sufficiency challenges is the complete picture that the evidence presents. <u>See Al-Talib</u>, 55 F.3d at 931. Consequently, we must not rend the garment of which the evidence is woven lest we analyze each individual fiber in isolation. <u>See Durrive</u>, 902 F.2d at 1229. The Supreme Court has admonished that we not examine evidence in a piecemeal fashion, but consider it in cumulative context. <u>See, e.g.</u>, <u>Kyles v. Whitley</u>, 115 S. Ct. 1555 (1995)

_____

**5** In <u>Wright v. West</u>, 505 U.S. 277 (1992), a case on collateral review, the Court explained the similarly limited nature of appellate review of sufficiency challenges:

> In <u>Jackson [v. Virginia</u>, 443 U.S. 307 (1979)], we emphasized repeatedly the deference owed to the trier of fact and, correspondingly, <u>the sharply limited nature of constitutional sufficiency review</u>. We said that "<u>all of the evidence</u> is to be considered in the light most favorable to the prosecution," that the prosecution need not affirmatively "rule out every hypothesis except that of guilt," and that a reviewing court "faced with a record of historical facts that supports conflicting inferences must presume--even if it does not affirmatively appear in the record--that the trier of fact resolved any such conflicts in favor of the prosecution, and we must defer to that resolution."

<u>Id.</u> at 296-97 (first emphasis added).

20

(explaining that the courts must evaluate the cumulative effect of evidence in connection with the prosecution's revealing exculpatory evidence to a habeas petitioner); Glasser, 315 U.S. at 80-81 (sustaining conspiracy convictions based on the circumstances surrounding the criminal activity). As the court in United States v. Douglas, 874 F.2d 1145, 1153 (7th Cir.), abrogated on other grounds by Durrive, 902 F.2d at 1228, and cert. denied, 493 U.S. 841 (1989), so cogently elucidated, "[w]hile any single piece of evidence, standing alone, might have been insufficient to establish [the defendant's] participation in the . . . drug conspiracy, a rational jury could infer from the totality of the evidence" that a conspiracy existed. The focus of appellate review, therefore, of the sufficiency of evidence to support a conviction is on the complete picture, viewed in context and in the light most favorable to the Government, that all of the evidence portrayed.

B.

Guided by the preceding principles, we address first Burgos's challenges to the sufficiency of the evidence to sustain his conspiracy conviction. Burgos asserts that his conviction must be reversed because the Government failed to prove that he participated in any conspiracy. We disagree. Viewing all of the evidence and the inferences to be drawn therefrom that were adduced at Burgos's trial in the light most favorable to the Government, we conclude that the evidence against Burgos is sufficient for a jury to find beyond a reasonable doubt that he participated in a conspiracy with Gobern and Gonzales to distribute cocaine base at North Carolina A&T University. Indeed, the dissent does not disagree that a conspiracy existed between Gobern and Gonzales, but merely takes issue with the sufficiency of the evidence regarding Burgos's participation in this conspiracy.

The most damning physical evidence establishing Burgos's participation in the conspiracy is that his left index fingerprint was impressed on the sealing mechanism at the top of the ziplock plastic bag in which the cocaine base was located. This plastic bag was wrapped in foil, which, in turn, was wrapped in newspaper, which was packaged in a box, which was wrapped in Christmas paper; in short, the cocaine base was intentionally and thoroughly concealed. Burgos devotes much energy to denigrating the fingerprint evidence,

21

particularly because, he posits, this evidence is the sole evidence linking him to the conspiracy, a position that we find frivolous, considering all of the evidence before the jury.

Federal appellate courts consistently have concluded that fingerprints constitute material, cogent proof in sustaining conspiracy convictions for contraband narcotics, particularly when viewed in the context of other circumstantial evidence. See, e.g., United States v. Langston, 970 F.2d 692, 706 (10th Cir.) (affirming a narcotics conspiracy conviction because the defendant was present at the location where the laboratory used to manufacture narcotics was operating, the odor of chemicals was prominent at the location, the defendant's car at one point reeked of ether, there was testimony that "all" involved persons had overseen the laboratory, and defendant's fingerprint was on laboratory instruments), cert. denied, 506 U.S. 965 (1992); United States v. Aichele, 941 F.2d 761, 763 (9th Cir. 1991) (noting that defendant's fingerprints on laboratory equipment, the odor of controlled substances in his residence and office, and the fact that the defendant's keys opened the laboratory constituted sufficient evidence to sustain a conspiracy conviction); United States v. Ivey, 915 F.2d 380, 385 (8th Cir. 1990) (sustaining a conspiracy conviction because the defendant's fingerprint was on the package containing the cocaine that a coconspirator collected, the defendant identified himself by his driver's license number when collecting money sent to him, and telephone conversations between the defendant and coconspirators coincided with these events); United States v. Obregon, 893 F.2d 1307, 1311-12 (11th Cir.) (upholding a conspiracy conviction to import cocaine because the defendant's fingerprints were placed on packages of drugs subsequent to the drugs' insertion in the packages and all indicted persons were aboard a boat modified to conceal drugs in a known drug-smuggling area), cert. denied, 494 U.S. 1090 (1990); United States v. Arzola-Amaya, 867 F.2d 1504, 1513 (5th Cir.) (affirming drug conspiracy convictions based on the defendants' fingerprints being found on a box containing cocaine and on beer bottles found in the vicinity of the criminal activity, the defendants' presence and drug paraphernalia at a "`stash house,'" and identification of a defendant by the secretary of a coconspirator), cert. denied, 493 U.S. 933 (1989). Burgos's fingerprint impressed on the sealing mechanism of the plastic bag containing cocaine base, which was concealed

22

inside a wrapped package, is a significant piece of evidence establishing his knowing and willful participation in the conspiracy.

The fingerprint evidence against Burgos is strikingly similar to that in United States v. Hastamorir, 881 F.2d 1551 (11th Cir. 1989). In Hastamorir, Defendant Ledezma contended that his conviction for conspiracy to possess with intent to distribute cocaine must be reversed for want of sufficient evidence. Id. at 1557. The evidence tying Ledezma to the conspiracy was his fingerprints on the exterior of two packages of cocaine. Id. According to Ledezma, this evidence "in no way demonstrate[d] that he knew what was inside the packages or that he had any intent to commit an illegal act." Id. The Eleventh Circuit rejected this argument and affirmed his conspiracy conviction. The court reasoned that the fingerprint evidence, when coupled with Ledezma's contradicted testimony that he was not with other coconspirators, permitted the jury to infer that Ledezma perjured himself to conceal his role in the conspiracy. Id. According to the Eleventh Circuit, the combined effect of a defendant with no credibility and his fingerprints on packages containing cocaine supported the conspiracy conviction, considering the totality of circumstantial evidence and construing all inferences in favor of the Government. As the Hastamorir court explained, the issue is not whether the appellate court was convinced of guilt beyond all reasonable doubt, but whether the jury was convinced of this conclusion and its verdict was based on substantial evidence. Id. at 1558.

The factual circumstances adduced from the testimony likewise give rise to the reasonable inference that Burgos knowingly and voluntarily participated in the conspiracy. Special Agent Kowalski testified that Burgos told him that Gobern possessed the wrapped Christmas package from the inception of the journey in New York:

> Q: Did [Burgos] say whether he talked to Gonzale[s] and Gobern while they were on the train?
>
> A: Yes, [Burgos] did. He rode with them. He told me that Mr. Gobern was the one who carried the package wrapped as a Christmas package.
>
> Q: All right. Did he make any statements as to how long Mr. Gobern had this package?

23

A: He said Mr. Gobern <u>had the package throughout the</u> <u>trip down</u>.

Q: All right. And did he tell you anything about what Mr. Burgos or Mr Gonzale[s] -- what Mr. Gonzale[s] or Mr. Gobern told him about what was in the package during the train trip?

A: <u>What Mr. Burgos told me was that he knew that they</u> <u>had dope, although he didn't see it. And it was his under-</u> <u>standing -- this is what he told me -- it was his understand-</u> <u>ing they were going to sell the dope at the A&T University</u>.

. . . .

Q: Did you ask him whether he knew that there was crack cocaine in the package?

A: <u>Yes. He said that he knew they had it, but he didn't</u> <u>actually see it</u>.

(J.A. at 67-68.) (emphasis added). In addition, Special Agent Kowalski testified that he fingerprinted Burgos and one of Burgos's fingerprints was on the plastic bag. Moreover, Burgos himself testified that Gobern, Gonzales, and the women sat behind him for the entire trip, he did not see anyone transfer material into a plastic bag, wrap or rewrap the package, nor did he leave his seat except for the occasional visit to the train lavatory. Thus, not only was there <u>positive</u> testimony of Burgos's knowing and willful participation in the conspiracy, but, as in <u>Hastamorir</u>, the testimony contradicted Burgos's trial testimony, permitting the jury to infer that he had perjured himself.

Contending that because Special Agent Kowalski was not aboard the train and Burgos's credibility was damaged because of demeanor evidence, the dissent asserts that <u>Hastamorir</u> does not support our position. <u>See post</u> at 78-79 n.11. We are baffled by this incorrect contention. Apparently, the dissent would require as a prerequisite to sustain a conspiracy conviction that law enforcement agents be present while the conspirators formulate their plans. In <u>Hastamorir</u>, as here,

24

the defendant lied, and the jury in each case found the testimony of other witnesses more credible than that of the defendants. The dissent contends that we are sustaining a conviction based purely on disbelief of Burgos. Our holding, however, rests on the unremarkable fact that Burgos gave conflicting renditions of the same events, and the jury chose to believe the rendition he told to Special Agent Kowalski. Moreover, as we explain, see infra pp. 27-33, if a defendant takes the stand, as Burgos did here, and the jury disbelieves him, this is simply added evidence of guilt.

The dissent erroneously posits that there is no evidence establishing that Burgos assisted in packaging the cocaine base prior to boarding the train in New York. See post at 69-71. As we demonstrate infra at 25-28, however, a reasonable jury could infer from the facts that Burgos did assist in packaging the cocaine base before boarding the train in New York. In this regard, the dissent also incorrectly states that Special Agent Kowalski never testified that Burgos said Gobern possessed the cocaine base when he left New York. See post at 53-54, 69-71. Here, Special Agent Kowalski's testimony established that Burgos had knowledge of the conspiracy to distribute cocaine base: Burgos knew that Gonzales and Gobern were transporting cocaine base, that it was being transported from New York City to Greensboro, that Gobern was the one who carried the wrapped Christmas package containing the cocaine base, and that the cocaine base was to be distributed at North Carolina A&T University.[6] In conjunction with this testimony, the evidence that Burgos's left index fingerprint was on the sealing mechanism of the plastic bag containing the cocaine base and Burgos's testimony that there were no materials to wrap or rewrap the package aboard the train permitted the jury to infer that Burgos assisted in packaging the cocaine base in New York. Even the dissent acknowledges that the time Gobern was in the train station lavatory was too brief an interlude for him to transfer the 78.5 grams of cocaine base into the plastic bag before concealing it behind the commode. The dissent stubbornly refuses to acknowledge, however, that, based on this evidence, a rational juror could conclude that

_____

[6] In this regard, the dissent speculates on why the Government never prosecuted Gonzales, attempting to bolster its position based on a negative. The record is silent regarding whether Gonzales is even alive or if the Government is cognizant of his whereabouts.

25

Burgos participated in the conspiracy by packaging the cocaine base in New York, even if this conclusion were not compelled. The issue is not whether "[a] rational juror would disagree on this too," post at 69, but whether a rational juror could find that Burgos assisted in packaging the cocaine base in New York, and a rational juror certainly could. Indeed, we find this to be the rational conclusion: How else could Burgos's fingerprint be found on an item inside a wrapped package that was wrapped since the inception of the trip from New York? Regardless, the jury was free to draw either conclusion, and substantial evidence supports the conclusion of guilt.

Despite the evidence and inferences establishing Burgos's knowing and willful participation in the conspiracy, our dissenting colleagues assert that we have excised from conspiracy jurisprudence the requirement that substantial evidence support the jury's finding that a defendant knowingly and willfully participated in a conspiracy. To the contrary, we specifically recognize this requirement of the offense, see supra p. 10; 12, and explain that the Government must prove it beyond a reasonable doubt, see supra pp. 11-12. While reciting the fundamental tenets of conspiracy law, the dissent fails to apply the principles that a defendant may be a member of a conspiracy without knowledge of or participation in its full scope and that a conspiracy need not be a tightly-knit organization run with precision. Only by viewing Special Agent Kowalski's testimony and all the evidence adduced at trial in a light most favorable to Burgos and by faulting the Government for not disproving Burgos's contradictory and vague explanations for the fingerprint evidence can the dissent conclude as a matter of law that no rational jury could draw the foregoing inferences. Viewed in a light most favorable to the Government, the evidence established that Burgos was not a mere traveling companion, but a knowing, willful participant in this narcotics distribution conspiracy.

The dissent also would enlarge the scope of our sufficiency review by asking whether Burgos's conviction can be sustained in the absence of proof that his explanation for his fingerprint was false. In the dissent's view, the Government shouldered the burden of producing "evidence that Gobern did not put the cocaine into an empty plastic bag bearing Burgos's fingerprint during the twelve hour train ride from New York," post at 70. Subscribing to this view, however, con-

26

travenes well-established principles of criminal law. In Holland, the Supreme Court eschewed the contention that the "Government[ ] . . . must exclude every reasonable hypothesis other than that of guilt." Holland, 348 U.S. at 139. We cannot, therefore, find the evidence of guilt insufficient simply because it failed to disprove every possible hypothesis regarding Burgos's purported innocence. The jury considered Burgos's defense as well as the Government's case, and our limited task in reviewing the verdict is simply to assure that substantial evidence supports it.

To reiterate, Burgos's fingerprint was impressed on the sealing mechanism of a plastic bag wrapped in aluminum foil, packed in newspaper, and encased in a wrapped package. At trial, Burgos explained the presence of his fingerprint on the sealing mechanism of the plastic bag by testifying that Gobern apparently consumed a sandwich Burgos prepared, and, unbeknownst to Burgos, placed the cocaine base in the plastic bag without leaving any of his own fingerprints on it. Burgos testified further that although he sat in front of Gobern during the trip from New York, he never saw the Christmas package prior to disembarking from the train. To accept Burgos's rendition of the testimony, the jury would have had to find that Gobern saved the plastic bag, entered the lavatory, tore open the Christmas package and the cereal box, unwrapped the newspaper and aluminum foil from the cocaine base, placed the cocaine base in the plastic bag without leaving his fingerprint, wrapped the plastic bag in aluminum foil, swaddled the aluminum foil in the newspaper, and secreted the cocaine base behind the commode. The implausibility of this transpiring within two minutes runs deep, as the dissent concedes. Regardless, while this account of events strikes us as highly implausible, material for our purposes is the fact that the jury disbelieved this version of the events, and its disbelief was rational, particularly given the context and content of the testimony of Officers Blanks and Kaplan and Special Agent Kowalski.

The competing versions of the evidence related by Special Agent Kowalski and Burgos establish another, critical circumstance supporting Burgos's participation in the conspiracy. Special Agent Kowalski testified that Burgos told him that he knew Gonzales and conversed with both Gonzales and Gobern on the train from New York. Additionally, Special Agent Kowalski testified that Burgos admitted that

27

he knew cocaine base was in the Christmas package that Gobern possessed from the commencement of the trip in New York and that the cocaine base was slated for distribution at a college in Greensboro, North Carolina. As a law enforcement agent, Special Agent Kowalski's testimony was likely compelling to the jury. See United States v. Arra, 630 F.2d 836, 849 (1st Cir. 1980) (stating that the testimony of the arresting officers alone would have been sufficient to sustain the conviction); United States v. Carney, 468 F.2d 354, 359 (8th Cir. 1972) (noting that the testimony of the arresting law enforcement agent was, standing alone, sufficient to affirm the conviction). The testimony of Special Agent Kowalski would have been sufficient to convict Burgos of conspiracy, regardless of his status as a law enforcement officer. Here, we are presented with the classic example of two witnesses offering conflicting testimony regarding the same events, and the jury decided which testimony to accept and which to reject; the testimony that was accepted by the jury in this appeal is sufficient to support the verdict. Indeed, at oral argument, counsel for Burgos conceded that for a jury to accept the testimony of Special Agent Kowalski and Officers Blanks and Kaplan is not irrational. Given this concession, especially when coupled with Burgos's fingerprint on the plastic bag, Burgos can hardly challenge his conspiracy conviction.

In stark contradiction to Special Agent Kowalski's testimony, however, Burgos denied making certain statements to Special Agent Kowalski, claiming that he never told him that Gobern carried the Christmas package on the train or that he knew Gobern and Gonzales were traveling to Greensboro to distribute cocaine base. Burgos could offer no explanation for the blatant discrepancies between his and Special Agent Kowalski's testimony. Burgos's contradicted testimony and his own conflicting responses on direct and cross-examination undoubtedly undermined his credibility, thereby supporting the inference that Burgos attempted to disavow his participation in the conspiracy. Relating implausible, conflicting tales to the jury can be rationally viewed as further circumstantial evidence indicating guilt. See, e.g., Wright, 505 U.S. at 295-96 (explaining that a defendant's contradictory, vague, and evasive answers contribute to a finding of guilt); United States v. Johnson, 64 F.3d 1120, 1128 (8th Cir. 1995) (observing that lying to law enforcement agents contributes to a finding of guilt), cert. denied, 116 S. Ct. 971 (1996); United States v.

28

Stanley, 24 F.3d 1314, 1321 (11th Cir. 1994) (noting that conflicting statements and implausible stories are indicia of guilt and enter the calculus for sustaining conspiracy convictions); United States v. Casilla, 20 F.3d 600, 606 (5th Cir.) (explaining that trial testimony that is inconsistent with various statements made to customs officials, especially when accompanied by other circumstantial evidence, gives rise to a reasonable inference that a defendant participated in a narcotics conspiracy and attempted to conceal his participation), cert. denied, 115 S. Ct. 240 (1994); United States v. Solis, 841 F.2d 307, 310 (9th Cir. 1988) (stating that "making up an implausible cover story" is a circumstance contributing to a finding of guilt in connection with a drug conspiracy). Not only did Burgos deny making statements to Special Agent Kowalski, he also offered the jury an implausible explanation for his fingerprint.

Indeed, in United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988), the Eleventh Circuit recognized "that a defendant's implausible explanation may constitute positive evidence in support of a jury verdict," and noted that such a finding was particularly apropos because the defendants' "explanation of their activities was dubious, if not wholly incredible." Observing that juries take account of incredible tales, Bennett explained that "[a] reasonable jury might well disbelieve the explanation and conclude that the [defendants] were lying in an attempt to cover up illegal activities." Id. A defendant's credibility is a material consideration in establishing guilt, and if a defendant "take[s] the stand . . . and denies the charges and the jury thinks he's a liar, this becomes evidence of guilt to add to the other evidence." United States v. Zafiro, 945 F.2d 881, 888 (7th Cir. 1991), aff'd, 506 U.S. 534 (1993). As the Wright Court explained, "[i]n evaluating [the defendant's] testimony . . . the jury was entitled to discount [the defendant's] credibility . . . [a]nd if the jury did disbelieve [the defendant], it was further entitled to consider whatever it concluded to be perjured testimony as affirmative evidence of guilt." Wright, 505 U.S. at 296. Preposterous as Burgos's testimony may seem, the jury could have believed it, but obviously the jury did not; instead, the jury believed Burgos's admissions to Special Agent Kowalski. Determining credibility of witnesses and resolving conflicting testimony falls within the province of the factfinder, not the reviewing court. See United States v. Bailey, 444 U.S. 394, 414-15 (1980). The dissent mistakenly declines to recognize that the jury evidently believed Bur-

29

gos perjured himself. As the Wright court explained, his perjured testimony could have been viewed as affirmative evidence of his guilt. Thus, Burgos's lying on the stand may have aided in establishing the fact that he was guilty.

Yet another circumstance supporting a guilty verdict is the fact that Burgos, Gobern, and Gonzales boarded a train from New York City. We have steadfastly acknowledged that New York City is a known source city for contraband drugs.[7] See, e.g., United States v. McFarley, 991 F.2d 1188, 1192 (4th Cir.), cert. denied, 114 S. Ct. 393 (1993); United States v. Alpert, 816 F.2d 958, 961 (4th Cir. 1987); United States v. Gooding, 695 F.2d 78, 83 (4th Cir. 1982); see also United States v. Carter, 985 F.2d 1095, 1097 (D.C. Cir. 1993) (noting that New York City is a source city for drugs); United States v. Glover, 957 F.2d 1004, 1006 (2d Cir. 1992) (same); United States v. Cooke, 915 F.2d 250, 251 (6th Cir. 1990) (same); United States v. Harris, 482 F.2d 1115, 1116 (3d Cir. 1973) (same). Additionally, all three men traveled together on the train, Gobern and Gonzales scheduled the same return trip, and Burgos's travel plans enabled him to accompany them,[8] which is circumstantial evidence bolstering an inference of guilt in a drug distribution conspiracy. See, e.g., Johnson, 64 F.3d at 1128; United States v. Sloley, 19 F.3d 149, 151 n.1 (4th Cir.), cert. denied, 114 S. Ct. 2757 (1994); Sanchez, 961 F.2d at 1178; United States v. Hanson, 801 F.2d 757, 765 (5th Cir. 1986). This circumstantial evidence assumes greater import here because Burgos's testimony that the men traveled separately was contradicted by Spe-

_____

[7] Contrary to the dissent's mischaracterization, we do not hold that traveling from a source city automatically renders one a narcotics conspirator. See post at 72-73. Rather, we simply note that traveling from a source city is a valid consideration that enters the calculus of guilt.

[8] The dissent takes us to task by stating that there is no evidence that Burgos scheduled the same return trip. See post at 73. While we do not know if Burgos scheduled the same return trip because his ticket was returned to him, we do know Burgos testified that he planned to stay in Greensboro one day, then travel to Laurinburg to play basketball with some friends. We also know that Burgos's travel plans enabled him to travel with Gobern and Gonzales at least on the trip down from New York to Greensboro where North Carolina A&T University is located, the distribution point of the cocaine base.

30

cial Agent Kowalski, tending to illustrate further Burgos's guilt. See Hastamorir, 881 F.2d at 1557 (holding that the jury was free to disregard the defendant's false testimony that he did not participate in the conspiracy); United States v. Eley, 723 F.2d 1522, 1525 (11th Cir. 1984) (concluding that a defendant's outlandish explanation of events constitutes positive evidence supporting a guilty verdict).

Moreover, although not dispositive, Burgos's presence at the scene of criminal activity "is material and probative in the totality of the[ ] circumstances" in determining his participation in a conspiracy. United States v. Jenkins, 779 F.2d 606, 612 (11th Cir. 1986); see also United States v. Saadeh, 61 F.3d 510, 525 (7th Cir.) (stating that while mere presence alone is insufficient to support a conspiracy conviction, presence coupled with an act that advances the conspiracy suffices to sustain conviction), cert. denied, 116 S. Ct. 521 (1995). Recognizing the import of presence at a crime scene, the Eleventh Circuit opined that conspiracy convictions will be sustained "when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." United States v. Figueroa, 720 F.2d 1239, 1246 (11th Cir. 1983). The dissent would denigrate the relevance of Burgos's presence on the train, accusing the majority of sustaining a conviction based on mere association. Singling out this one fact, the dissent ignores all the other evidence establishing Burgos's guilt. The jury may well have viewed Burgos's continued presence in the train car as more than mere presence or association. In view of all the evidence before it, the jury reasonably may have questioned why Burgos remained for so long in the presence of known narcotics traffickers.

Not only did Burgos, Gobern, and Gonzales travel together from a source city, but it was Burgos who purchased Gobern's and Gonzales's tickets so that the three men could travel aboard the same train, adding more circumstantial evidence tending to prove Burgos's participation in the conspiracy. See, e.g., James, 40 F.3d at 873 (observing that purchasing airline tickets for conspirators is cogent circumstantial evidence tending to establish a conspiracy and illustrating that not every participant in a drug trafficking conspiracy actually sells drugs, but many participants furnish goods or services for the conspiracy, such as providing moneyorders, firearms, or shelter);

31

Sanchez, 961 F.2d at 1178 (noting, in sustaining the sufficiency of the evidence to support a drug conspiracy conviction, that the defendant procured the plane tickets for her coconspirators on the same flight). Furthermore, according to his own testimony, Burgos was acquainted with Gonzales, all three men apparently were from the same neighborhood in New York, and Burgos and Gonzales exchanged telephone numbers. This type of familiarity constitutes further circumstantial evidence that Burgos participated in the conspiracy. See James, 40 F.3d at 873 (recognizing that acquaintance and ability to contact others associated with the conspiracy permits a jury to conclude that a defendant participated in the conspiracy); United States v. Disla, 805 F.2d 1340, 1349 (9th Cir. 1986) (appreciating that friendship among coconspirators contributes to a finding of conspiracy); United States v. Meester, 762 F.2d 867, 882 (11th Cir.) (observing that acquaintance with coconspirators tends to support conspiracy conviction), cert. denied, 474 U.S. 1024 (1985); see also United States v. Martinez, 987 F.2d 920, 922 (2d Cir. 1993) (noting the import of exchanging telephone numbers among conspirators and that this ability to exchange numbers contributes to a finding of guilt in a narcotics distribution conspiracy); United States v. Gomez, 927 F.2d 1530, 1532 (11th Cir. 1991) (observing that coconspirators possessed each others' telephone numbers).

The dissent attempts to undermine the probity of this evidence by asserting that there was "no evidence presented showing that Burgos . . . lied to the police about knowing Gobern and Gonzales." Post at 81. We do not find this statement accurate. Special Agent Kowalski testified that Burgos said he knew Gonzales, but not Gobern. Burgos testified somewhat contradictorily, however, that he only knew Gonzales as "Tone," and subsequently that he told Special Agent Kowalski that he did not know either man, but only knew Gonzales from the area. In addition to the contradictory nature of Burgos's accounts, the veracity of his assertions is further thwarted by the fact that the men also attempted to depart the terminal in a single taxicab; thus, they not only left New York in tandem and traveled simultaneously, but also attempted to depart from the train terminal collectively.

Implying that we are filling in evidentiary gaps with inferences of guilt, the dissent impermissibly draws inferences of Burgos's innocence based on supposed gaps in the evidence and the argument that

32

the discrepancies between Special Agent Kowalski's and Burgos's conflicting rendition of the events are only inferences. See post at 76-80 & n.11. For instance, the dissent contends no witnesses testified that Burgos knew Gobern before the train trip, presented no evidence that Burgos planned to travel with Gobern and Gonzales, and adduced no proof that Burgos previously had engaged in narcotics trafficking or carried implements of the trafficking trade. These alleged "gaps" in the evidence do not exist, however. First, Burgos testified that he knew Gonzales from areas they frequented in New York and Gobern was also around those areas. Moreover, we have demonstrated that the jury could infer that Burgos and Gobern planned to travel together: Burgos purchased Gobern's and Gonzales's train tickets, traveled with Gobern and Gonzales, provided them with food, and remained in their company rather than distance himself from them. We also disagree with the characterization that the discrepancies between Burgos's and Special Agent Kowalski's testimony are inferences. Burgos's conflicting stories and Special Agent Kowalski's direct testimony are not inferences, but are positive statements that Burgos knowingly and willingly participated in the conspiracy. The final contention that Burgos had no prior narcotics convictions is not an element of the crime of conspiracy and hence not a burden of the Government to prove. Under that rationale, no one could breach the criminal law for the first time for want of a criminal history. Inexplicably, the dissent harps on these circumstances, yet ignores the overwhelming circumstantial evidence of guilt. Our task, however, is to review the evidence that was presented, not as the dissent has done to prescribe the evidence that it would have liked to have seen elicited.

Concluding that the evidence is insufficient to sustain Burgos's conviction, the dissent ignores the abundance of direct and circumstantial evidence. Conspicuously, for example, the dissent fails to mention that Burgos exchanged telephone numbers with Gonzales. Also, the dissent refuses to acknowledge that Burgos's testimony was evasive and self-contradictory -- incredibly incriminating characteristics -- and that his counsel conceded at oral argument that the guilty verdict was not irrational. The dissent also disingenuously attempts to ascribe innocuous purposes to surreptitious conduct. For instance, the dissent states that Burgos summoned the cab solely for himself, but Burgos testified that "we were all standing outside. . . . [it] was me

33

Gobern, and Gonzale[s]." (J.A. at 126R.) This also begs the question of why Burgos "made the cab reservations," (J.A. at 126-S,) if, as he stated, his friend Robert Lewis was to pick him up at the train station upon his telephone call, but when Lewis did not answer, Burgos called Henry DeGraffenreed, who said he would be there in thirty minutes. In addition, Officer Blanks testified explicitly that all "three subjects, including Mr. Burgos, was [sic] getting in the back of the cab together." (J.A. at 50.) The dissent also questions Burgos's guilt because he carried no cash. The jury may have perceived Burgos as escorting his cash source, i.e., the cocaine base, to Greensboro where he and his coconspirators would convert it into cash; in short, the jury reasonably could find that he had no cash because the sale of the cocaine base had not occurred.

While some of this evidence, if viewed in isolation, could appear innocuous, "such [an] argument misses the mark; our inquiry is whether <u>any</u> reasonable jury could find the elements of the crime, on these facts, beyond a reasonable doubt, not whether[Burgos] is plausibly not guilty." <u>Aichele</u>, 941 F.2d at 764. Construing all of this evidence and its reasonable inferences in favor of the Government leads inexorably to the conclusion that substantial evidence supports Burgos's conspiracy conviction. The sum total of the evidence presented reveals: (1) physical evidence forensically proving that Burgos's fingerprint was on the sealing mechanism of the cocaine base-filled plastic bag in the Christmas package that Gobern carried from New York; (2) Burgos knew that the Christmas package contained cocaine base and that it was slated for distribution at a college in Greensboro, North Carolina; (3) Burgos purchased Gonzales's and Gobern's train tickets; (4) the Christmas package and a cereal box were ripped open on the sink, newspaper was scattered about the lavatory, and this newspaper was from the same edition of the same newspaper wrapped around the aluminum foil that swaddled the plastic bag with Burgos's fingerprint that contained the cocaine base; (5) Burgos was familiar with Gonzales and conversed with Gobern and Gonzales during the train trip, as well as provided them with nourishment; (6) Burgos's testimony was riddled with conflicting, equivocal responses and was contradicted by Special Agent Kowalski; (7) Burgos, Gobern, and Gonzales attempted to leave the train terminal in a single taxicab. Based on the plethora of evidence, we conclude that a rational jury could find beyond a reasonable doubt that Burgos participated in the

34

conspiracy; indeed, we would be hard-pressed to accept that a jury could conclude otherwise. In this respect, the dissent disregards yet another precept of conspiracy jurisprudence: We do not analyze evidence in a piecemeal manner, but must consider its cumulative effect, which is precisely what we have accomplished. Conversely, the dissent dissects the direct and circumstantial evidence by separately dismissing selective pieces, not by analyzing all of the evidence in context. We, therefore, affirm Burgos's conviction for conspiracy to possess with intent to distribute cocaine base. [9]

C.

We now analyze the evidence to determine whether it was sufficient to support Gobern's conspiracy conviction. As an initial matter, much of the evidence and rationale that compels us to affirm the conspiracy conviction against Burgos applies equally to Gobern. We conclude that, based on the evidence presented at Gobern's trial, a rational jury could find, beyond a reasonable doubt, that Gobern conspired with another to distribute cocaine base in North Carolina; indeed, his role in the conspiracy is not challenged, nor does he challenge his conviction and sentence of possession.

As we previously observed, Burgos, Gobern, and Gonzales traveled together on the train from New York, and traveling together is probative evidence of the totality of the circumstances used to prove a conspiracy. See, e.g., Johnson, 64 F.3d at 1128; Sloley, 19 F.3d at 151 n.1. Although they traveled in tandem, Burgos, Gobern, and Gonzales separated once at the terminal, yet another inculpating feature of conspiratorial conduct, see United States v. Cardenas, 9 F.3d 1139, 1157 (5th Cir. 1993), cert. denied, 114 S. Ct. 2150 (1994) (noting, in a drug importation conspiracy case, that the defendants traveled

---

[9] Ironically, the dissent concludes, see post at 72-73 & 80, that there was sufficient evidence to convict Gobern of conspiracy based on the sequentially numbered tickets, and the facts that Gobern and Gonzales traveled together, they returned on the same date, they denied knowing one another, and Gobern transported the cocaine. All of this evidence, plus a good bit more, was adduced at Burgos's trial, yet anomalously, the dissent concludes that with regard to Burgos, this same evidence is insufficient to sustain his conviction.

35

together, but then separated when crossing the United States border), because it tends to establish that Burgos, Gobern, and Gonzales knew one another but consciously sought to evade detection of their acquaintance. After seemingly separating, Burgos, Gobern, and Gonzales then regrouped and attempted to enter the same taxicab. In addition to traveling with Burgos and Gonzales, Gobern traveled from New York City, a known source city for controlled substances, see McFarley, 991 F.2d at 1192. These pieces of circumstantial evidence also help comprise the totality of the circumstances necessary to support Gobern's conspiracy conviction.

There is still more. Gobern's demeanor also constituted inculpating circumstantial evidence. For instance, Gobern surveyed with interest Officer Blank's conversation with Gonzales. The jury rationally could have perceived such countersurveillance as participating in the conspiracy, see United States v. Penagos, 823 F.2d 346, 348 (9th Cir. 1987), and as circumstantial evidence tending to establish the existence of a conspiracy, see United States v. Sasson, 62 F.3d 874, 887 (7th Cir. 1995), cert. denied, 116 S. Ct. 953 (1996); Saadeh, 61 F.2d at 525; Brooks, 957 F.2d at 1147. Indeed, the Seventh Circuit has concluded that countersurveillance standing alone is sufficient to convict a defendant of conspiracy to possess with intent to distribute drugs. See United States v. Pazos, 993 F.2d 136, 137 (7th Cir. 1993). Countersurveillance provides a conspiracy with an essential service in ensuring that the conspiracy is cloaked and executed in a manner to avoid exposure. In addition to his countersurveillance, Gobern was nervous, and nervous behavior is further circumstantial evidence from which a jury reasonably could infer guilt. See Stanley, 24 F.3d at 1321; Cardenas, 9 F.3d at 1157; United States v. Pineda-Ortuno, 952 F.2d 98, 102 (5th Cir.), cert. denied, 504 U.S. 928 (1992); United States v. Ayala, 887 F.2d 62, 69 (5th Cir. 1989).

In addition to the surfeit of evidence discussed thus far, both Gobern and Gonzales produced train tickets bearing the name "Anthony Flores." Employing an alias and attempting to conceal identity reinforces the conclusion of the existence of a conspiracy. See, e.g., Johnson, 64 F.3d at 1128 (giving false names is evidence of guilt in a drug distribution conspiracy); James, 40 F.3d at 873 (noting that in reviewing a sufficiency challenge to a conspiracy conviction the fact that the defendant purchased tickets for coconspirators under an alias

36

constituted evidence of guilt); Sanchez, 961 F.2d at 1178 (concluding that a defendant's use of an alias to purchase plane tickets for her coconspirators on the same flight is evidence of guilt in a conspiracy); Ayala, 887 F.2d at 69 (observing that a defendant's purchasing three train tickets, two of which bore identical names, aids in establishing sufficient evidence to support a conviction); Disla, 805 F.2d at 1349 (ruling that concealing the identity of participants to a criminal enterprise is probative evidence demonstrating guilt in a conspiracy); Hanson, 801 F.2d at 765 (elucidating that two defendants bearing the same alias contributed to finding of guilt in a narcotics conspiracy). Moreover, the tickets held by Gobern and Gonzales bore consecutive numbers, were purchased on the same date, at the same locale, for the same destination and the same return date. Possessing sequentially numbered tickets is further indicia of the conspiracy. See United States v. Fuentes-Moreno, 895 F.2d 24, 26 (1st Cir. 1990) (noting that airline tickets purchased the same date in the same place and bearing sequential numbers is probative circumstantial evidence of a conspiracy); cf. also United States v. Montas, 41 F.3d 775, 777 (1st Cir. 1994) (noting that consecutive baggage-claim check numbers and adjacent seat assignments contribute to a finding of guilt), cert. denied, 115 S. Ct. 1986 (1995); United States v. Cipriano, 765 F.2d 610, 612 (7th Cir. 1985) (per curiam) (holding that possessing sequentially numbered airline tickets contributes to totality of circumstances warranting probable cause for arrest). Moreover, Officer Blanks testified that the men traveled together and that they attempted to leave the train terminal by boarding a single taxicab.

Of course, a highly material piece of evidence establishing a conspiracy and Gobern's participation in it was that Burgos's fingerprint was found on the sealing mechanism of the plastic bag containing the cocaine base that was in the Christmas package Gobern carried. The fact that Burgos's fingerprint was on an interior article wrapped in a package held by Gobern from the inception of the train trip could demonstrate to a rational finder of fact that Burgos and Gobern conspired to distribute the cocaine base. Based on this circumstantial evidence, a rational jury could find beyond a reasonable doubt the existence of a conspiracy and Gobern's connection to it. Viewing this evidence and the reasonable inferences drawn from it in the light most favorable to the Government, we conclude that substantial evidence supports Gobern's conviction for conspiracy.

37

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 93-5899

FRANK KAHLED BURGOS,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                                          No. 93-5919

ALEXIO BURNARD GOBERN,
<u>Defendant-Appellant.</u>

Appeals from the United States District Court
for the Middle District of North Carolina, at Greensboro.
N. Carlton Tilley, Jr., and William L. Osteen, Sr.,
District Judges.
(CR-93-13)

Argued: September 26, 1995

Decided: August 23, 1996

Before WILKINSON, Chief Judge, and RUSSELL, WIDENER,
HALL, MURNAGHAN, ERVIN, WILKINS, NIEMEYER,
HAMILTON, LUTTIG, WILLIAMS, MICHAEL, and MOTZ,
Circuit Judges.

_____

Affirmed in part and dismissed in part by published opinion. Judge Williams wrote the majority opinion, in which Chief Judge Wilkinson and Judges Russell, Widener, Wilkins, Niemeyer, Hamilton, and Luttig joined. Judge Michael wrote an opinion concurring in part and dissenting in part, in which Judges Hall, Murnaghan, Ervin, and Motz joined.

---

## COUNSEL

**ARGUED:** Thomas Norman Cochran, Assistant Federal Public Defender, Greensboro, North Carolina, for Appellant Burgos; Joseph R. Giaramita, Jr., Brooklyn, New York, for Appellant Gobern. Michael Francis Joseph, Assistant United States Attorney, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Todd M. Peebles, PEEBLES & SCHRAMM, Winston-Salem, North Carolina, for Appellant Gobern. Walter C. Holton, United States Attorney, Greensboro, North Carolina, for Appellee.

---

## OPINION

IV.

We now consider Burgos's conviction for possession with intent to distribute cocaine base and aiding and abetting that crime, in violation of 18 U.S.C.A. § 2 (West 1969) and 21 U.S.C.A. § 841(a)(1) (West 1981). Mounting the same challenge to the possession conviction as to the conspiracy conviction, Burgos posits that the evidence proving possession and aiding and abetting is insufficient to support his conviction. Again, we disagree and affirm the jury's finding that substantial evidence supports his conviction.

The elements necessary to prove a conviction for possession with intent to distribute cocaine base are: (1) possession of the cocaine base; (2) knowledge of this possession; and (3) intention to distribute the cocaine base. See United States v. Nelson, 6 F.3d 1049, 1053 (4th Cir. 1993), cert. denied, 114 S. Ct. 2142 (1994). Possession may be "actual or constructive, and it may be sole or joint." Id. Thus,

40

"[p]ossession need not be exclusive, but may be shared with others." Laughman, 618 F.2d at 1077 (alteration in original) (internal quotation marks omitted). Constructive possession may be proved by demonstrating "that the defendant exercised, or had the power to exercise, dominion and control over the item." United States v. Rusher, 966 F.2d 868, 878 (4th Cir.), cert. denied, 506 U.S. 926 (1992). Like conspiracy, "[c]onstructive possession may be established by either circumstantial or direct evidence." Nelson, 6 F.3d at 1053. The requisite intent to distribute may be inferred if the quantity of drugs is greater than would be used for personal consumption. See Roberts, 881 F.2d at 99. Multiple persons possessing a large quantity of drugs and working in concert sufficiently establish constructive possession. See United States v. Watkins, 662 F.2d 1090, 1097-98 (4th Cir. 1981), cert. denied, 455 U.S. 989 (1982).

A defendant is guilty of aiding and abetting if he has "knowingly associated himself with and participated in the criminal venture." United States v. Winstead, 708 F.2d 925, 927 (4th Cir. 1983). In order to prove association, the Government must establish that the defendant participated in the principal's criminal intent, which requires that a defendant be cognizant of the principal's criminal intent and the lawlessness of his activity. See id. As we explained in United States v. Arrington, 719 F.2d 701 (4th Cir. 1983), cert. denied, 465 U.S. 1028 (1984), "[t]o be convicted of aiding and abetting, `[p]articipation in every stage of an illegal venture is not required, only participation at some stage accompanied by knowledge of the result and intent to bring about that result.'" Id. at 705 (quoting United States v. Hathaway, 534 F.2d 386, 399 (1st Cir.), cert. denied, 429 U.S. 819, (1976)) (second alteration in original). The same evidence establishing a defendant's participation in a conspiracy may support a conclusion that a defendant participated in the principal's unlawful intent to possess and distribute drugs, thereby proving guilt of aiding and abetting as well. See id. at 705-06.

The focus concerning the possession and aiding and abetting count centers on Burgos's fingerprint being impressed on the plastic bag containing the cocaine base, evidence that Burgos maintains is insufficient to support his conviction. Relying on United States v. Van Fossen, 460 F.2d 38 (4th Cir. 1972), and United States v. Corso, 439 F.2d 956 (4th Cir. 1971) (per curiam), Burgos contends that circuit

41

precedent mandates a reversal of the possession and aiding and abetting conviction. In <u>Corso</u>, Corso was convicted of entering a federal credit union with the intent to commit larceny. <u>See Corso</u>, 439 F.2d at 956-57. The only evidence demonstrating Corso's guilt was a matchbook cover with Corso's fingerprint on it that was used to jam a door lock in the building where the credit union offices were located, a broken piece of a screw driver, a screw driver located in the credit union, and testimony that Corso purchased goods on credit by making cash down payments soon after the burglary of the credit union had occurred. <u>Id.</u> at 957. With the exception of the matchbook cover, Corso's fingerprints were not found at the scene of the crime, and there was no proof establishing when Corso's fingerprints were impressed on the matchbook cover. <u>Id.</u> Explaining that "there was no direct evidence as to ownership or possession of either screwdriver" and "no direct evidence to show that [Corso's] fingerprints were impressed upon the [matchbook] cover at the time of the burglary," the court reversed Corso's conviction, summarily stating that "[t]he probative value of an accused's fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed <u>only</u> during the commission of the crime." <u>Id.</u>

Relying on <u>Corso</u>, in <u>Van Fossen</u> we reversed Van Fossen's conviction for possessing engraving plates with intent to use them to counterfeit federal reserve notes and printing and photographing images of the notes. <u>Van Fossen</u>, 460 F.2d at 39. The evidence on which Van Fossen was convicted consisted of his fingerprints on an engraving plate and a photographic negative used in counterfeiting. <u>Id.</u> at 39-40. In reversing Van Fossen's conviction, we focused on the temporal nature of when the crime was committed and when Van Fossen's fingerprints were impressed on the plate and negative. <u>Id.</u> at 41. We concluded that "[b]ecause no evidence in the record suggest[ed] that the [finger]prints were impressed when the crime was committed," the jury's verdict was based "on conjecture and suspicion." <u>Id.</u>

According to Burgos, <u>Corso</u> and <u>Van Fossen</u> compel reversal of his conviction because they establish that his fingerprint on the plastic bag lacks sufficient probative value to demonstrate participation in the conspiracy. In <u>United States v. Harris</u>, 530 F.2d 576 (4th Cir.

42

1976) (per curiam), however, we distinguished the principles articulated in Corso and Van Fossen. Harris was convicted of bank robbery on the basis of fingerprints taken from the holdup note he presented to the bank teller and Harris's confession. Id. at 579. Relying on Corso, Harris challenged his conviction, asserting that the evidence was insufficient to sustain the conviction. Id. We rejected his assertion, explaining:

> Harris contends that the fingerprints identified as his on the written [holdup] note presented to the bank teller could have been impressed on the paper before the demand was written or presented. Our holding in Corso is not dispositive of this question because that opinion merely states that when fingerprint evidence is of questionable probative value, it cannot sustain a conviction if it is the only substantive evidence presented. In the present case, the fingerprint evidence was in addition to the incriminating admissions by the defendant as shown by the government's evidence.

Id. See also United States v. Bryant, 454 F.2d 248, 250-51 (4th Cir. 1972) (concluding that the discovery of fingerprints apparently recently impressed in an area that was generally inaccessible to the public constituted sufficient evidence to sustain the conviction). Similarly, in United States v. Anderson, 611 F.2d 504, 509 (4th Cir. 1979), we followed Harris's characterization of Corso and rejected the defendant's contention "that fingerprints on movable objects per se lack probative value." In this regard, the dissent's characterization of Anderson as "reconciling" these cases is perplexing.

While the reasoning and holdings of Corso and Van Fossen have been limited by subsequent decisions, we conclude nonetheless that they are inapt with respect to Burgos's possession conviction. Unlike Corso and Van Fossen, the fingerprint evidence was not the only incriminating evidence establishing Burgos's guilt; rather, there was an abundance of evidence establishing that Burgos was guilty of possession with intent to distribute cocaine base, namely the evidence establishing that Burgos was guilty of conspiracy. Because sufficient evidence proved that Burgos participated in the conspiracy to possess with intent to distribute cocaine base, proof of constructive possession

43

is sufficient to convict him of possession with intent to distribute. See Laughman, 618 F.2d at 1076.

The dissent's maintaining that the evidence was insufficient to sustain the possession and aiding and abetting counts is erroneous for the same reasons that it is erroneous regarding the conspiracy conviction. Contrary to the dissent's incorrect assertion, we do provide a basis for our holdings, concluding that the dissent fails to understand possession and aiding and abetting law. First, Burgos's fingerprint was found on the sealing mechanism of the plastic bag containing 78.5 grams of cocaine base, a quantity substantially inconsistent with personal use. The dissent is simply incorrect as a matter of fact and law that the only evidence establishing Burgos's guilt was the fingerprint. Second, Special Agent Kowalski testified that Burgos told him that he knew Gobern's Christmas package contained cocaine base, and he knew that Gobern and Gonzales planned to distribute the cocaine base in Greensboro. Third, Burgos facilitated the journey by providing tickets and sustenance, as well as protecting the cocaine base by sitting nearby during the entire trip. Fourth, in addition to this conclusive testimony, Burgos attempted to conceal his knowledge of the cocaine base by denying that he made such statements to Special Agent Kowalski. Viewing all of this evidence and that discussed earlier in Part III.B. in the light most favorable to the Government and construing all reasonable inferences in favor of the Government, we conclude that a rational jury could convict Burgos of possession with intent to distribute cocaine base. Under Arrington, the same evidence proving Burgos's participation in the conspiracy supports the jury's conclusion that he exercised constructive possession with intent to distribute the cocaine base and thus was guilty of aiding and abetting the crime of possession with intent to distribute cocaine base. Accordingly, we affirm Burgos's conviction of possession with intent to distribute cocaine base and aiding and abetting.

V.

We now turn to Gobern's sentence. Gobern was convicted of conspiracy pursuant to 21 U.S.C.A. §§ 841(a)(1), 846 and of possession pursuant to 18 U.S.C.A. § 2 and 21 U.S.C.A. § 841(a)(1). A conviction rendered pursuant to § 841(a)(1) involving more than fifty grams of cocaine base results in a mandatory minimum ten-year prison sen-

44

tence pursuant to 21 U.S.C.A. § 841(b)(1)(A) (West Supp. 1995). Gobern, therefore, incurred a statutory mandatory minimum sentence of ten years. With a total offense level of thirty-two and a criminal history category of one, Gobern achieved a guideline range of 121-151 months imprisonment, and the district court sentenced Gobern to 121 months imprisonment.**10** Pursuant to 18 U.S.C.A. § 3742 (West 1985), Gobern challenges his sentence on two grounds. First, he asserts that the district court erred in failing to depart downward based on his single act of aberrant behavior. <u>See</u> U.S.S.G., Ch.1, Pt. A, 4(d), p.s. Second, Gobern asserts for the first time on appeal that the statutory sentencing ratio for cocaine powder versus cocaine base offenses violates the Equal Protection Clause. Gobern's first challenge to his sentence is not appealable, and his second challenge is meritless.

A.

Gobern contends first that the district court erred in failing to depart downward based on a single act of aberrant behavior. According to Gobern, his participation in the conspiracy and his possession of the cocaine base are isolated acts; he specifically relies on the fact that he has no prior connection with drug trafficking activity. The district court disagreed with this characterization of Gobern's participation and the crimes, observing that Gobern's participation in the crimes was planned and calculated, as evidenced by the previously wrapped Christmas package, the well-planned trip, the consecutive numbers on the train tickets having the same destination and duration, and Burgos's obtaining the tickets and providing food; therefore, the district court declined to depart downward.

Here, Gobern committed an offense that statutorily mandated a minimum of 120 months imprisonment, and the district court sentenced him to 121 months imprisonment under the Sentencing Guide-

---

**10** Even though he was sentenced pursuant to the Sentencing Guidelines, Gobern does not contend that the Sentencing Guidelines violate the Equal Protection Clause; rather, Gobern limits his challenge solely to the statutory mandatory minimum contained in § 841(b)(1)(A). Regardless, the rationale undergirding the Sentencing Guidelines and § 841(b)(1)(A) is the same, and neither violates the Equal Protection Clause.

45

lines. Guideline departures do not apply to a sentence mandated by statute, see United States v. Crittendon, 883 F.2d 326, 331 (4th Cir. 1989), so the most that the district court could have departed was one month, a fact of which the district court was aware. In sentencing Gobern, the district court recognized that it had the authority to depart downward, but it refused, explaining that the circumstances did not warrant a downward departure. If a district court is cognizant of its authority to depart, but does not do so, such a refusal to depart downward from the guideline range is simply not appealable. See United States v. Bayerle, 898 F.2d 28, 30-31 (4th Cir.), cert. denied, 498 U.S. 819 (1990). Accordingly, we dismiss this challenge to Gobern's sentence.

B.

Gobern's second challenge to his sentence is that it violates the Equal Protection Clause. This challenge was not raised in the district court, and while we generally do not address issues in the first instance on appeal, we can address an issue not raised in the district court if plain error would result from our declining review. See United States v. Olano, 507 U.S. 725, 732-33 (1993). We review this challenge because a sentence that violates the Constitution would be plainly erroneous as one imposed in violation of law. See Bayerle, 898 F.2d at 31; see also 18 U.S.C.A. § 3742(a)(1) (West 1985) (providing that a sentence that violates the law is appealable). Determining whether Gobern's sentence violates the Equal Protection Clause entails resolution of a legal issue, which successive courts freely review, see Murphy, 35 F.3d at 145.

Subsection 841(b)(1)(A) provides for a mandatory minimum ten-year sentence for violations of § 841(a)(1) involving more than fifty grams of cocaine base, and results in a sentencing disparity between offenses involving cocaine base versus those involving cocaine powder. Under § 841(a)(1), one unit of cocaine base is equated with 100 units of cocaine powder; thus, possessing a much smaller quantity of cocaine base results in a lengthier sentence than possessing the same quantity of cocaine powder. Gobern, who describes himself as a "person of color," posits that the sentencing disparity violates the Equal Protection Clause because Caucasians are more frequently convicted

46

of offenses involving cocaine powder, while "persons of color" are more frequently convicted of offenses involving cocaine base.

We have consistently sustained the constitutionality of sentencing disparity between cocaine base and cocaine powder based on an equal protection challenge, rejecting repeatedly the argument that Burgos now seeks to advance. See, e.g., United States v. Fisher, 58 F.3d 96, 99-100 (4th Cir.) (sentencing disparity under § 841(b)(1)(A) does not violate the Equal Protection Clause), cert. denied, 116 S. Ct. 329 (1995); United States v. Jones, 18 F.3d 1145, 1151 (4th Cir. 1994) (sentencing disparity under the Sentencing Guidelines does not violate the Equal Protection Clause); United States v. D'Anjou, 16 F.3d 604, 612 (4th Cir.) (same), cert. denied, 114 S. Ct. 2754 (1994); United States v. Bynum, 3 F.3d 769, 774 (4th Cir. 1993) (same), cert. denied, 114 S. Ct. 1105 (1994); United States v. Thomas, 900 F.2d 37, 39-40 (4th Cir. 1990) (sentencing disparity under § 841(b)(1)(A) does not violate the Equal Protection Clause). We observed in D'Anjou that "[e]very federal appellate court to consider the equal protection challenge under the racial disparity theory has agreed with this conclusion." D'Anjou, 16 F.3d at 612; see also Bynum, 3 F.3d at 774 n.7 (collecting cases rejecting Gobern's contention). Despite these precedents, Gobern invites us to reconsider this conclusion based on possible amendments to the Sentencing Guidelines, but we decline his invitation -- as did Congress. Congress specifically rejected the Sentencing Commission's proposed amendment to lessen the penalty disparity between cocaine-base versus cocaine-powder offenses premised on quantity of drugs:

> [Congress] disapproves the Commission's recommended amendment to equalize the penalties for distributing crack and powder cocaine, thereby preserving the current guideline sentences for crack cocaine trafficking offenses. . . .

> . . . .

> On June 29, 1995, the Judiciary Committee's Crime Subcommittee held a hearing to examine the Sentencing Commission's recommended changes to the sentencing guidelines that would equalize penalties for similar quantities of crack and powder cocaine. Many of the hearing wit-

47

nesses, including members of the Sentencing Commission, acknowledged important differences between crack and powder cocaine: . . . .

On June 22, 1995, the Judiciary Committee's Crime Sub-committee heard compelling testimony from law enforcement leaders . . . . They warned Congress, in unmistakable terms, not to lower crack penalties to those of powder cocaine offenses, because of the more destructive nature of the crack market.

H.R. Rep. No. 104-272, 104th Cong., 1st Sess. 141, reprinted in 1995 U.S.C.C.A.N. 335, 336-37. We shall not endorse what Congress has specifically rejected.

Gobern's sentence does not violate the Equal Protection Clause because "the law does not discriminate on its face[,] . . . there is no argument of discriminatory application of the law[,] . . . nor evidence advanced that a discriminatory purpose entered the hearts of those who enacted [the law]." D'Anjou, 16 F.3d at 612. Failing to demonstrate such a showing, we review only to determine if § 841(b)(1)(A) has a rational basis, which it does:

Congress could rationally have concluded that distribution of cocaine base is a greater menace to society than distribution of cocaine powder and warranted greater penalties because it is less expensive and, therefore, more accessible, because it is considered more addictive than cocaine powder and because it is specifically targeted toward youth.

Thomas, 900 F.2d at 39-40. Accordingly, we conclude that Gobern's contention that his sentence violates the Equal Protection Clause is without merit.

VI.

Considering the totality of the circumstances and viewing the evidence in the light most favorable to the Government, we conclude that a rational jury certainly could have found substantial evidence beyond

48

a reasonable doubt to convict Burgos and Gobern of conspiracy to possess with intent to distribute cocaine base and to convict Burgos of possession with intent to distribute cocaine base and aiding and abetting. Accordingly, we affirm Burgos's and Gobern's conspiracy convictions; likewise, we affirm Burgos's possession and aiding and abetting conviction. Regarding Gobern's sentence respecting the downward departure, because the district court was cognizant of its ability to depart downward, its refusal to do so is not appealable; thus, we dismiss that portion of the appeal. We reject Gobern's contention that his sentence violates the Equal Protection Clause. Accordingly, his sentence is affirmed.

AFFIRMED IN PART AND DISMISSED IN PART

MICHAEL, Circuit Judge, dissenting in part and concurring in part:

Nearly a half century ago, Justice Jackson expressed concern that the history of the law of conspiracy "exemplifies the `tendency of a principle to expand itself to the limit of its logic.'" Krulewitch v. United States, 336 U.S. 440, 445 (1949) (Jackson, J., concurring) (quoting B. Cardozo, The Nature of the Judicial Process 51). Justice Jackson further warned that:

> The unavailing protest of courts against the growing habit to indict for conspiracy in lieu of prosecuting for the sub-stantive offense itself, or in addition thereto, suggests that loose practice as to this offense constitutes a threat to fair-ness in our administration of justice.

Id. at 445-46. Unfortunately, I believe that today's majority opinion confirms the fears expressed by Justice Jackson. The majority has turned the law of conspiracy--at least in the context of alleged drug conspiracies--into the law of "mere association." Burgos's conviction stands simply because he hung around with the wrong people on a

long train ride. Indeed, as of today there seems to be little that does not allow inference of conspiracy. I, therefore, respectfully dissent insofar as the majority opinion affirms Burgos's conviction.

I do believe that based on traditional principles of conspiracy law, there was sufficient evidence presented at Gobern's trial to show that he was involved in a conspiracy with Gonzales--though not with Burgos. I, therefore, concur in the judgment, but not the reasoning, of the majority insofar as it sustains Gobern's conspiracy conviction. I also concur in the majority's treatment and disposition of the sentencing issues raised by Gobern.

I.

A.

At Burgos's trial the following facts were presented to the jury. On January 25, 1993, three men, Alexio B. Gobern, Anthony Gonzales, and Frank K. Burgos, traveled on the same train from New York City to Greensboro, North Carolina. Gobern, Gonzales, and Burgos got off the train at the AmTrak station in Greensboro. Burgos was first off, followed by Gonzales and then Gobern. They did not walk together on the platform. Gobern carried a Christmas-wrapped package and a blue knapsack. Although the package was not elaborately wrapped, it had no loose ends.

As part of routine drug interdiction work, Police Officer Daniel Kaplan stopped and questioned Burgos before he reached the terminal building. Burgos produced his train ticket, which was in his name. Police Officer Berkley Blanks stopped and questioned Gonzales, and Gobern paused to watch the questioning of Gonzales. Officer Blanks and Gonzales then walked to the front of the terminal building, and Gobern followed and watched. At Officer Blanks' request, Gonzales produced his train ticket, which was in the name of "Anthony Flores." By this time, Officer Kaplan had finished questioning Burgos and had joined Officer Blanks and Gonzales in front of the terminal building.

Gobern then entered the terminal building and walked to the men's restroom with the wrapped package and the knapsack. Approximately

51

one to two minutes later, Gobern came out of the restroom with the knapsack but without the wrapped package. No one else entered or exited the restroom during this time. After Gobern exited the restroom, Officer Kaplan stopped and questioned him. Officer Kaplan asked for Gobern's train ticket, which was also in the name of "Anthony Flores." Both Gobern and Gonzales denied that they knew each other or that they were traveling together. However, both Gobern's and Gonzales's tickets were in sequential order, bore the same name, were issued on January 25, and had identical return dates of January 27.

Officers Kaplan and Blanks then searched the restroom after telling Officer Cameron Piner to watch Gobern, Gonzales, and Burgos. Inside the restroom the officers saw the Christmas package and a cereal box torn open on the sink, and they found a balled-up New York City newspaper, The Daily News, behind the commode. Inside the newspaper, the officers found aluminum foil; inside the aluminum foil was a ziploc plastic bag containing "crack" cocaine. After finding the cocaine, Officers Kaplan and Blanks went outside and saw Gobern, Burgos, and Gonzales standing near a pay phone. There was a cab with an open door, and it appeared that Gobern, Burgos, and Gonzales were preparing to leave. Gobern was arrested, and Burgos and Gonzales were asked to go to the police station. At the police station all three men were questioned and fingerprinted. Special Agent Wayne Kowalski of the DEA conducted the questioning and fingerprinting. At the end of the evening Gobern was detained, and Burgos and Gonzales were released.

The Greensboro Police sent the wrapping paper, cereal box, newspaper, and aluminum foil to a North Carolina lab for fingerprint analysis. Agent Kowalski sent the cocaine and plastic bag to a DEA lab in Miami for analysis. Three of Gobern's prints were found on the wrapping paper, and one of Burgos's prints was found on the plastic bag. It could not be determined when the cocaine was placed in the bag or when Burgos touched the bag. The aluminum foil was not tested for cocaine residue.

At Burgos's trial Agent Kowalski testified that when he questioned Burgos on January 25, Burgos said (1) that he (Burgos) knew Gonzales but did not know Gobern, (2) that Burgos "drove down on the

52

train with Gonzales and Gobern from New York," (3) that "Gobern had the package throughout the trip down," (4) that Gobern and Gonzales "had dope although Burgos did not see it," and (5) that Gobern and Gonzales "were going to sell the dope at the A&T University."

In addition, the Government and the majority claim that Agent Kowalski testified that Burgos said (1) that he knew that crack cocaine was in the wrapped package and (2) that Gobern had the crack cocaine inside the wrapped package from the time he left New York. Govt. Br. at 12; ante at 5, 25-26 & 27-28. While it is evident from the trial transcript that the Assistant United States Attorney repeatedly attempted to elicit such testimony from Agent Kowalski, a reading of the transcript shows that Agent Kowalski never in fact so testified:

> Q. Did [Burgos] say whether he talked to Gonzales and Gobern while they were on the train?
>
> A. Yes, he did. He rode with them. He told me that Mr. Gobern was the one who carried the package wrapped as a Christmas package.
>
> Q: All right. Did he make any statements as to how long Mr. Gobern had this package?
>
> A: He said Mr. Gobern had the package throughout the trip down.
>
> Q: All right. And did he tell you anything about what Mr. Burgos or Mr. Gonzales -- what Mr. Gonzales or Mr. Gobern told him about what was in the package during the train trip?
>
> A: What Mr. Burgos told me was that he knew that they had the dope although he didn't see it. And it was his understanding -- this is what he told me -- it was his understanding they were going to sell the dope at the A&T University.

> \* \* \* \*

53

> Q: Did you ask him whether he knew that there was crack cocaine in the package?
>
> A: Yes. He said he knew they had it, but he actually didn't see it.

That last question and answer are the closest that Agent Kowalski came to testifying that Burgos said that the crack was inside the package throughout the trip. Yet, Agent Kowalski's answer of "yes" is only to the question of whether he (Kowalski) asked Burgos whether he (Burgos) knew that there was crack in the package. Agent Kowalski never testified, as the majority mistakenly contends, that Burgos admitted that he (Burgos) "knew cocaine base was in the Christmas package that Gobern possessed from the commencement of the trip in New York . . . ." Ante at 28. Nor can it be said, based on Agent Kowalski's testimony or any other evidence in Burgos's trial, that the plastic bag was inside the wrapped package "since the inception of the trip from New York[.]" Id. at 26.

In his defense Burgos testified that he was currently attending college in New York City and that he was traveling to North Carolina to visit friends. He planned to spend a day in Greensboro, but his ultimate destination was Laurinburg Institute, a prep school he had attended.

Burgos boarded the train in New York City. While near the front of the ticket line at Penn Station, he was approached by Anthony Gonzales. Burgos knew Gonzales from his neighborhood as "Tone," though he did not know Gonzales's last name. Because he was running late, Gonzales asked Burgos to get his (Gonzales's) tickets, and he gave Burgos the ticket money and a piece of paper with the reservation numbers. The tickets were in the name of "Anthony Flores," and not knowing Gonzales's last name, Burgos thought nothing of it. He gave Gonzales the tickets, boarded the train, and sat down by himself. After he was seated, Gonzales, Gobern, and two young women came by. Gonzales introduced Burgos to Gobern. Gonzales, Gobern, and the two women sat behind Burgos on the train.

The trip from New York to Greensboro lasted approximately twelve hours, and Burgos had brought sandwiches and snacks to eat.

54

He had packed the food in ziploc bags. He offered some of his food to Gonzales, Gobern, and the women. Eventually, Gonzales and Gobern ate some of the sandwiches. Burgos did not see what they did with the ziploc bags after they ate the food. According to Burgos, the ziploc bags were of the same type as the one found containing the cocaine.

Burgos further testified that the conversation on the train consisted of "general stuff: music, girls." Burgos also said that he exchanged telephone numbers with Gonzales, though he did not exchange numbers with Gobern.

In contrast to the testimony provided by Agent Kowalski, Burgos testified that there was no conversation about drugs on the train and that he did not see the wrapped package until Gonzales and Gobern were being questioned by the police at the train station. Burgos explained that he called a cab after Officer Blanks told him in a hostile manner to leave the train station. He called the cab for himself, not for Gobern and Gonzales. When the cab arrived, Burgos moved to open the door, but Officer Piner stopped him and told him not to leave. After Burgos stepped back to the platform, Officers Kaplan and Blanks came out of the train station and arrested Gobern.

Robert Lewis, a friend of Burgos's and a student at North Carolina A&T University, testified that Burgos called him a few days before the train trip. Burgos told Lewis that although he was coming down to visit him in Greensboro, his main purpose was to visit Laurinburg Institute. In addition, Vernon Johnson, a dormitory director at Laurinburg Institute testified that Burgos called him in January 1993 and said that he (Burgos) was coming down to Laurinburg Institute to play basketball, which he had done in the past. Burgos's final witness was a character witness, Frank McDuffy, the headmaster of Laurinburg Institute. McDuffy testified that he and Burgos had developed a relationship like that between father and son, that Burgos was in his opinion truthful, and that Burgos would visit Laurinburg when he was in North Carolina.

Based on this evidence, the jury convicted Burgos of conspiracy to possess cocaine base with intent to distribute. The jury also convicted

55

Burgos of possession of cocaine base with intent to distribute. He was sentenced to 131 months imprisonment.

B.

At Gobern's trial many of the same facts were also presented to the jury. For example, the jury was told that Gobern entered the AmTrak terminal building and walked to the men's restroom with the wrapped package and the knapsack; that Gobern came out of the restroom with the knapsack but without the wrapped package; and that after Gobern left the restroom, Officer Kaplan stopped and questioned him. In addition, there was testimony that when questioned both Gobern and Gonzales denied that they knew each other or that they were traveling together. Also, the two train tickets introduced at Gobern's trial showed that both his and Gonzales's tickets were in sequential order, bore the same name, were issued on January 25, and had identical return dates of January 27. And, of course, Gobern's jury was presented with evidence showing that the crack cocaine was found in the restroom.[1]

The evidence presented at Gobern's trial was not, however, identical to that presented at Burgos's trial. At Gobern's trial Agent Kowalski did not testify concerning statements made by Burgos at the police station. Thus, Gobern's jury was not told that Burgos said (1) that he (Burgos) knew Gonzales but did not know Gobern, (2) that Burgos rode down on the train with Gonzales and Gobern from New York, (3) that Gobern had the package throughout the trip down, (4) that Gobern and Gonzales had dope although Burgos did not see it, and (5) that Gobern and Gonzales were going to sell the dope at the A&T University.

In addition, Gobern did not testify at his trial and neither did Burgos or Gonzales.

_____

[1] Although the fingerprint evidence was also introduced at Gobern's trial, and the Government said that Burgos was involved in the alleged conspiracy, the Government's main pitch to Gobern's jury was that Gobern and Gonzales conspired together to possess and distribute the crack cocaine.

The jury convicted Gobern of conspiracy to possess cocaine base with intent to distribute and possession with intent to distribute cocaine base. Gobern was sentenced to 121 months imprisonment.

II.

At the outset, I emphasize that I agree with the majority's conclusion that once a conspiracy has been established, the Government need only show a "slight connection" between the defendant and the established conspiracy. See ante at 16-17. In addition, while the majority does not expressly state what it believes to constitute a "slight connection," I assume the majority agrees that to establish a "slight connection" the Government must present substantial evidence showing that the defendant knowingly and wilfully participated in the conspiracy. Although we have not always been completely faithful to this standard, see United States v. Truglio, 731 F.2d 1123 (4th Cir.), cert. denied, 469 U.S. 862 (1984), it is the law of this circuit and others. United States v. Chindawongse, 771 F.2d 840, 844 (4th Cir. 1985) ("The evidence of the `slight connection' . . . must be of a quality which will reasonably support a conclusion that the defendant wilfully participated in the unlawful plan with intent to further some object or purpose of the conspiracy.") (quoting United States v. Miranda-Uriarte, 649 F.2d 1345, 1349-50 (9th Cir. 1981)), cert. denied, 474 U.S. 1085 (1986); United States v. Laughman, 618 F.2d 1067, 1075 (4th Cir.) ("Simply proving the existence of a conspiracy . . . cannot sustain a verdict against an individual defendant. There must also be a showing of that defendant's knowledge of the conspiracy's purpose and some action indicating his participation.") (citations omitted), cert. denied, 447 U.S. 925 (1980); see United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir.) (upholding drug conspiracy conviction when there was "ample evidence establishing the active participation of [the defendants] in the conspiracy") (emphasis added), cert. denied, 505 U.S. 1228 (1992). See also United States v. Campbell, 985 F.2d 341, 345 (7th Cir. 1993) ("To establish that participatory link, the Government must offer sufficient evidence to demonstrate that the defendant knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose."); United States v. Cloughessy, 572 F.2d 190, 191 (9th Cir. 1977) (To establish a slight connection, "[e]vidence has to be produced to show that [the defendant] had knowledge of the conspiracy

57

and acted in furtherance of it. Mere casual association with conspiring people is not enough.") (citations omitted).

With that said, however, I believe that the majority has confused the concept of what elements make a conspiracy with the principles by which we determine whether sufficient evidence has been presented to establish those elements. Thus, I cannot agree with the majority's sweeping statement that "our conspiracy jurisprudence" is a collection of "elastic, ad hoc principles." Ante at 16.

No doubt because of the covert nature of most conspiracies, the particular evidence upon which the Government may rely to establish a conspiracy and a defendant's connection thereto often differs from case to case. And, of course, the Government may rely upon circumstantial evidence to prove a conspiratorial agreement, a defendant's knowledge of the conspiracy, and a defendant's participation in it. Id. at 10. Co-conspirators do not often advertise the fact that they are involved in an illegal endeavor, and it is uncommon for them to memorialize their agreement in a written document. See Iannelli v. United States, 420 U.S. 770, 777 n.10 (1975) ("The agreement need not be shown to be explicit. It can instead be inferred from the facts and circumstances of the case.") (citation omitted).**2**

Likewise, because conspiracies have "an elusive quality," ante at 11-12, and are often "loosely-knit, haphazard, or ill-conceived," id., the conspiracy concept has an elastic quality to it. See Krulewitch, 336 U.S. at 445 (Jackson, J., concurring) ("This case illustrates a pres-

_____

**2** Of course, the fact that the agreement need not be explicit (i.e., the agreement may be tacit) does not mean that the agreement need not be specific, as the majority incorrectly suggests. See ante at 15 (mistakenly citing Iannelli as support for the proposition that the conspiratorial agreement need not be specific). And, I am not "misperceiv[ing] the difference between conspiracy to commit the crime and the activity that can constitute participation in the conspiracy." See id. at 15-16 n.2. Again, the Government may prove its case based on circumstantial evidence, but that evidence (to be sufficient) must be such that a rational juror could believe beyond a reasonable doubt that there existed a specific agreement to commit a specific crime and that the defendant knowingly and wilfully participated in the conspiracy.

ent drift in the federal law of conspiracy which warrants some further comment because it is characteristic of the long evolution of that elastic, sprawling and pervasive offense.").

Yet, the elasticity of the concept does not in turn soften the principles by which we determine whether substantial evidence has been presented showing that a crime has been committed. In addition, the elasticity of the concept does not relieve the Government of its burden to prove each element of the crime beyond a reasonable doubt. Accordingly, though the law of conspiracy is flexible in its application, it is not boundless. United States v. Bell, 954 F.2d 232, 236 (4th Cir. 1992), cert. denied, 510 U.S. 835 (1993). As we have rightly recognized in the past, under the black letter law of conspiracy:

> [M]ore than being a bad person with intent to commit a crime is required [before a conspiracy conviction can be sustained]. A conspiracy is not shown until the government has presented evidence of a specific agreement to commit a specific crime, for the same criminal purpose, on the part of all indicted conspirators.

Id. at 237-38 (emphasis in original); see United States v. Giunta, 925 F.2d 758, 764 (4th Cir. 1991) ("[C]ircumstantial evidence that proves nothing more than association between two persons, even if one has a fixed intent known to the other to commit an unlawful act, is not sufficient to permit the inference of the requisite agreement between the two to act in concert to commit the act.") (citations omitted); United States v. Pupo, 841 F.2d 1235, 1238 (4th Cir.) (en banc) (agreeing that "mere knowledge, acquiescence, or approval of a crime is not enough to establish that an individual is part of a conspiracy to distribute drugs. Nor is mere presence at the scene of a distribution of drugs sufficient to prove participation in a conspiracy.") (citations omitted), cert. denied, 488 U.S. 842 (1988). See also Laughman, 618 F.2d at 1074 ("[T]he gist or gravamen of the crime of conspiracy is an agreement to effectuate a criminal act.") (emphasis in original; citation omitted).

To hold, as the majority does, that "elastic, ad hoc principles" govern the application of the law of conspiracy to the facts of a case is to condone decisionmaking without clear principles-- decisionmak-

59

ing that is particularly ill-suited for determining whether any crime has been committed. Indeed, one need look no further than the cases presented here to be certain that under the majority's approach <u>any</u> fact that shows that individuals associated together (or were simply acquainted) may be turned into evidence showing the existence of a conspiracy and a defendant's participation therein. I will mention just a few examples at this point (the rest are discussed in detail <u>infra</u>): as the majority sees it, (1) that Burgos was acquainted with Gonzales, (2) that Burgos, Gonzales, and Gobern were from the same neighborhood, and (3) that Burgos and Gonzales exchanged phone numbers are all facts showing that Burgos participated in a conspiracy. <u>See ante</u> at 32. While I believe one would be hard-pressed to say that these facts show anything more than mere association, and a very weak association at that, under the majority's "elastic, ad hoc principles," these are all facts that establish Burgos's guilt.

Needless to say, analysis such as that represents the kind of "loose practice" that Justice Jackson specifically warned against in <u>Krulewitch</u>, a practice that "constitutes a threat to fairness in our administration of justice." 336 U.S. at 446 (Jackson, J., concurring). <u>See also Bell</u>, 954 F.2d at 237 (recognizing that courts should have "a significant reluctance to apply a conspiracy conviction to individuals whose most heinous crime is choosing the wrong friends"); <u>United States v. Falcone</u>, 109 F.2d 579, 581 (2d Cir.) (Hand, J.) ("so many prosecutors seek to sweep within the drag-net of conspiracy all those who have been associated in any degree whatever with the main offenders. That there are opportunities of great oppression in such a doctrine is very plain, and it is only by circumscribing the scope of such all comprehensive indictments that they can be avoided."), <u>aff'd</u>, 311 U.S. 205 (1940). In short, reliance on "elastic, ad hoc principles" allows for conspiracy convictions to be based on no more than a defendant's "mere association" with alleged co-conspirators, rather than substantial evidence establishing the existence of a conspiracy and a defendant's knowing and wilful participation therein.

Moreover, I cannot agree with the majority that our decisions in either <u>United States v. Giunta</u> or <u>United States v. Bell</u> are incorrectly decided. These decisions properly stated and applied basic principles of conspiracy law. Yet, the majority has now chosen to overrule them because, according to the majority, (1) the decision in <u>Giunta</u> "ap-

60

pli[es] . . . `heightened vigilance' to reverse a [conspiracy] convic-
tion," ante at 13, suggesting "a heightened standard for reviewing
conspiracy convictions," id. at 14; (2) the decision in Bell (along with
Giunta) "cannot be squared with" the law of conspiracy, id. at 15; and
(3) "Bell can be read as increasing the quantitative connection
required to tie a defendant to a conspiracy," id. at 17.

The majority is, however, flatly wrong to perceive the decisions in
Giunta and Bell as creating any conflict with the established law of
conspiracy. And, in fact, any perceived conflict is simply a manifesta-
tion of the majority's own misunderstanding about the law of conspir-
acy and our role in reviewing conspiracy convictions.**3**

_____

**3** Since Giunta was decided in 1991, we have cited the case in sixteen
published decisions, and we have never once before today either criti-
cized or questioned its analysis or statements of law. Of those sixteen
published decisions, thirteen involved conspiracy convictions. We
upheld convictions in ten of those thirteen decisions, see United States
v. Heater, 63 F.3d 311 (4th Cir. 1995); United States v. Johnson, 54 F.3d
1150 (4th Cir.), cert. denied, 116 S. Ct. 266 (1995); United States v.
Harris, 39 F.3d 1262 (4th Cir. 1994); United States v. Kennedy, 32 F.3d
876 (4th Cir. 1994), cert. denied, 115 S. Ct. 939 (1995); United States
v. Moore, 11 F.3d 475 (4th Cir. 1993), cert. denied, 114 S. Ct. 1864
(1994); United States v. Banks, 10 F.3d 1044 (4th Cir. 1993), cert.
denied, 114 S. Ct. 1850 (1994); United States v. Mills, 995 F.2d 480 (4th
Cir.), cert. denied, 510 U.S. 904 (1993); United States v. Chambers, 985
F.2d 1263 (4th Cir.), cert. denied, 510 U.S. 834 (1993); United States v.
Baker, 985 F.2d 1248 (4th Cir. 1993), cert. denied, 114 S. Ct. 682
(1994); United States v. Marby, 953 F.2d 127 (4th Cir. 1991), cert.
denied, 504 U.S. 914 (1992); and we reversed convictions in three of
those decisions, see United States v. Dozie, 27 F.3d 95 (4th Cir. 1994);
United States v. Winfield, 997 F.2d 1076 (4th Cir. 1993); United States
v. Bell, supra.

Since Bell was decided in 1992, we have cited the case in ten pub-
lished decisions, and like Giunta, we have never once before today either
criticized or questioned its analysis or statements of law. Of those ten
published decisions, eight involved conspiracy convictions. We upheld
convictions in seven of those eight decisions, see United States v.
Lamarr, 75 F.3d 964 (4th Cir. 1996); United States v. Morsley, 64 F.3d
907 (4th Cir. 1995), cert. denied, 116 S. Ct. 749 (1996); United States
v. Heater, supra; United States v. Capers, 61 F.3d 1100 (4th Cir. 1995);

61

In Giunta, a case involving an alleged drug conspiracy, we reviewed the entire trial record and found that it was a "shadowy one" and that there was little evidence of conduct, independent of conversations between investigative agents and the alleged conspirators, pointing to the requisite criminal agreement that the law of conspiracy demands. 925 F.2d at 765. We expressed concern that"[i]n this circumstance, the danger of guilt being found on the basis of speculation from mere association between criminally disposed people, related criminal behavior, and like considerations is acute." Id. We then cited Justice Jackson's opinion in Krulewitch and Judge Goldberg's opinion in United States v. Caro, 569 F.2d 411, 418 (5th Cir. 1978), saying that:

> In the decade since Judge Goldberg wrote in Caro , conspiracy has of course continued a "potent and oft-used weapon in the prosecutorial arsenal," particularly in connection with the drug trafficking prosecutions that increasingly dominate federal criminal dockets. And Justice Jackson's concerns about the special risks of unfairness in conspiracy prosecutions in general have simply been magnified in drug conspiracy prosecutions as understandable outrage and frustration have charged the "war on drugs" presently underway as avowed national policy.

Giunta, 925 F.2d at 766.

Contrary to what the majority believes, see ante at 12-13, these "pronouncements" only recognized the obvious. That is, to guard against the danger of convicting a defendant based on speculation rather than fact--a danger especially acute when conspiracy is charged--we must take care to ensure that sufficient evidence is presented to the jury. The majority is now bothered that in Giunta we

_____

United States v. Johnson, supra; United States v. Mills, supra; United States v. Chambers, supra; and we reversed in one, see United States v. Winfield, supra.

If (as the majority suggests) I believe that "conspiracy is a Frankenstein's monster that has grown out of control," ante at 13, neither Giunta or Bell have been used to curb its growth.

62

chose the words "heightened vigilance" to make this clear. But far from suggesting that it is appropriate to apply "a heightened standard for reviewing conspiracy convictions," id. at 14, we did just the opposite. After stating the facts in the light most favorable to the Government, we went on to state and apply the appropriate standard of review that governs sufficiency of the evidence challenges on appeal. And, of course, that standard demands that we not only draw all reasonable inferences in favor of the Government, but that we also look to the entire record, including both the evidentiary strengths and weaknesses of the Government's case, to determine whether the convictions could be sustained. As we stated quite clearly and comprehensively:

> [W]e do not of course suggest that the judiciary may under any circumstances properly view conspiracy prosecutions with general disfavor, nor skew the judicial function at the trial or appellate level to reflect that disfavor. Conspiracy is a crime no less than are "substantive" offenses; the Jackson v. Virginia standard applies equally to assessing proof of both. Our assessment of the sufficiency of the evidence to convict of conspiracy here must therefore of course proceed as it would in respect of any substantive offense. There is no special, more stringent standard in conspiracy. What is appropriate, however, is the recognition, carrying forward Justice Jackson's in Krulewitch, that the very "elasticity" of the conspiracy concept may and frequently does tend to produce more "slippery" facts in proof than do prosecutions for less "elastic" substantive offenses, with a corresponding greater danger that speculation rather than reason may be required to make the necessary leaps of inferences to find guilt. Heightened vigilance to guard against the increased risks of speculation, though not a heightened standard, is warranted in conspiracy prosecutions.

> Our assessment of the evidence here reveals exactly the degree of "slipperiness" of factual proof that Justice Jackson feared as a general phenomenon and that Judge Goldberg found present in Caro. Our conclusion -- a raw judgment call at odds with that of the district court -- is that because of its cumulative weakness in various respects, the evidence

63

> here could only lead to a finding of guilt by an unacceptable process of raw speculation rather than by a reasoned process of inferring guilt beyond a reasonable doubt.
>
> Because our ultimate assessment is one of cumulative weakness of the evidence in various respects, we analyze it in terms of those specific weaknesses. <u>We precede the analysis proper with the observation that our earlier account of the facts has been set out in considerable detail and in light of the appropriate evidence assessment standard, precisely to serve as a framework for analysis. That is to say, the facts as recited are essentially those developed by the evidence considered in the light most favorable to the government.</u>

<u>Giunta</u>, 925 F.2d at 766 (emphasis added; footnote omitted).**4**

As for <u>Bell</u>, there is nothing remarkable about requiring the Government to show the existence of "a <u>specific</u> agreement to commit a <u>specific</u> crime" before a conspiracy conviction can be obtained. <u>See</u>

---

**4** As in <u>Giunta</u>, the cases presented here ultimately come down to "a raw judgment call" about the sufficiency of the Government's evidence against Burgos and Gobern. As I explain <u>infra</u>, I believe that "call" requires that Burgos's conviction be reversed and that Gobern's be affirmed. Surprisingly, the majority evidently believes that once the facts are presented and the law is properly stated and applied, the ultimate decision of whether sufficient evidence has been presented to the jury is <u>not</u> a judgment call. <u>See ante</u> at 14 & 18-19 n.4. Yet, if deciding whether sufficient evidence has been presented to the jury is not a judgment call, then I am not sure what is.

Moreover, in making this judgment call, I have not, as the majority believes, "disingenuously attempt[ed] to ascribe innocuous purposes to surreptitious conduct." <u>Ante</u> at 33. Rather than being disingenuous, my analysis is based on the existing law in this circuit and the evidence presented at the separate trials of Burgos and Gobern. Burgos's counsel made a similar point at oral argument, explaining that based on the evidence presented a jury could infer that a conspiracy existed between Gobern and Gonzales, and that Burgos had knowledge of the conspiracy, but that a jury could not reasonably infer Burgos's participation in the Gobern/Gonzales conspiracy. <u>Compare id.</u> (asserting that Burgos's "counsel conceded at oral argument that the guilty verdict was not irrational").

64

954 F.2d at 237-38 (emphasis in original). Suppose, for instance, law enforcement agents discover that drugs are being stored and sold at a certain location, go to that location, and find that one individual is selling drugs and another individual is using drugs. There is, of course, no conspiracy shown from these facts. Both individuals are guilty of some crime, the seller for possession with intent to distribute and distribution, and the user for simple possession. Neither, however, is guilty of conspiracy because there is no evidence showing that they specifically agreed to commit any crime. Nor, for that matter, is there any evidence of knowing and wilful participation in a conspiracy.[5]

In addition, our decision in Bell does not "increas[e] the quantitative connection required to tie a defendant to a conspiracy." See ante at 17. In Bell we held that the defendants' conspiracy convictions had to be reversed because the Government failed to present sufficient evidence showing that there existed a specific agreement to commit a specific crime. 954 F.2d at 238 ("The evidence is far too general to support a conviction for any concerted action incident to a specific conspiracy."). Therefore, other than saying that "mere association" is not enough, id. at 237, we had no occasion to discuss what "quantitative connection" the Government must show between an existing conspiracy and a defendant before the defendant's conspiracy conviction can be obtained.

In sum, a defendant's connection with an existing conspiracy is not established unless there is substantial evidence showing that the defendant voluntarily took part in some action that affirmatively links him with the conspiracy and showing that he knowingly and wilfully joined the conspiracy. E.g. United States v. Chindawongse, 771 F.2d

_____

[5] Our decision in United States v. Morsley, 64 F.3d 907 (4th Cir. 1995), cert. denied, 116 S. Ct. 749 (1996), is not to the contrary. In that case, there existed an established conspiracy to buy and sell unregistered firearms for both cocaine and cash. Id. at 919. Because there was no question that a conspiratorial agreement existed among the individuals selling the unlicensed firearms, we analyzed the case to determine whether the defendants knowingly and wilfully participated in that conspiracy. Id. Compare ante at 16 (asserting that Morsley holds that "there need not be evidence of a specific agreement in order to sustain a conspiracy conviction").

65

840, 844 (4th Cir. 1985), <u>cert. denied</u>, 474 U.S. 1085 (1986). To hold otherwise allows the Government to convict and punish a person based upon that person's mere association with conspirators. That has never been the law.

I will now apply these basic and long-established conspiracy principles to the facts presented at the separate trials of Burgos and Gobern.

A.

At Burgos's trial the Government presented substantial evidence to the jury showing that Burgos <u>associated</u> with Gobern and Gonzales. I think it clear, however, that the Government failed to present substantial evidence that Burgos knowingly and wilfully participated in a Gobern/Gonzales drug conspiracy to possess crack cocaine with intent to distribute.

Viewed in the light most favorable to the Government, the evidence at Burgos's trial established the existence of a conspiracy between Gobern and Gonzales. Most importantly, Agent Kowalski's testimony about Burgos's alleged admissions shows that Gobern and Gonzales traveled together from New York City with the intent to distribute crack cocaine in Greensboro, North Carolina.[6]

_____

[6] Agent Kowalski's testimony on this point does, however, raise a question that was not explored at Burgos's trial. If, when questioned by Agent Kowalski on the night of Gobern's arrest, Burgos did in fact implicate Gobern and Gonzales in a conspiracy to possess and distribute crack cocaine, why then was <u>Gonzales</u> released by the police? Indeed, to this day Gonzales has never been indicted on the crimes for which Burgos and Gobern were charged. Of course, Burgos's alleged admissions to Agent Kowalski were, among other things, not in furtherance of the alleged conspiracy and, thus, would not likely be admissible at a trial of Gonzales (which may also explain why Agent Kowalski did not testify as to Burgos's alleged admissions at Gobern's trial). Nevertheless, at the time Burgos made his alleged admissions to Agent Kowalski, the police had no way of knowing that Burgos would later deny making the statements or that he would later be indicted and, therefore, be unlikely to testify at a trial of Gobern or Gonzales. I want to make clear that my central

66

Agent Kowalski's testimony further shows (as does Burgos's) that Burgos associated with Gobern and Gonzales during the trip from New York City. Indeed, Burgos does not deny that he bought two train tickets on Gonzales' behalf, that he sat near Gobern and Gonzales throughout the trip, or that he talked with Gobern and Gonzales during the trip. What, of course, Burgos does deny is that he participated in a Gobern/Gonzales conspiracy, and Burgos has denied any such participation from the moment he was questioned by Agent Kowalski. Thus, the Government had to prove beyond a reasonable doubt that Burgos wilfully joined and participated in the Gobern/Gonzales conspiracy with the intent to further, promote, and accomplish its criminal purpose.

At trial, however, the Government offered no testimony, admission, or co-conspirator declaration showing that Burgos wilfully joined and participated in the Gobern/Gonzales conspiracy. The Government offered no evidence that Burgos possessed tools of the drug trade (e.g., firearms or unexplained cash). The Government offered no evidence that drugs were found in Burgos's possession. The Government offered no evidence that Burgos used an alias. The Government offered no evidence that Burgos was scheduled to travel back to New York on the same train as Gobern and Gonzales. The Government offered no evidence that Burgos made reservations to travel with Gobern and Gonzales. And the Government offered no evidence that Burgos knew Gobern prior to the time of the train trip.

There are thus only two facts offered by the Government to show that Burgos participated in a Gobern/Gonzales conspiracy. First, Burgos's fingerprint was discovered on the plastic bag that contained the crack cocaine, and second, Burgos, Gobern, and Gonzales were traveling "together" on January 25, 1993. Despite the majority's attempt

_____

question here is not, as the majority believes, why Gonzales was never prosecuted, see ante at 25 n.6, but rather it is why Gonzales was released by the police right after Burgos made his alleged admissions. Also, I raise this point not to suggest that the police handled these cases improperly in any way, but merely to suggest that Agent Kowalski's testimony at Burgos's trial does raise some inconsistencies which have never been explained.

67

to weave these two fibers into a cloak of guilt, see ante at 21, these facts (separately or together) do not provide substantial evidence that Burgos knowingly and wilfully participated in a Gobern/Gonzales conspiracy.

1.

The Government says the fingerprint is probative evidence that Burgos participated in the conspiracy because the jury could rationally infer that the fingerprint was impressed on the baggie when it contained crack cocaine. Although the Government's fingerprint expert acknowledged he did not know whether Burgos touched the bag when it contained crack,[7] the Government argues that the inference nevertheless can be drawn.

The majority agrees with the Government and points out that Gobern did not have sufficient time to transfer the crack cocaine to the plastic bag during his one or two minutes in the train station restroom. Ante at 25. The majority also points to the testimony of Agent Kowalski and contends that "a reasonable jury could infer from the facts that Burgos did assist in packaging the cocaine base before boarding the train in New York." Id. at 25. And, in particular, the majority believes that because Agent Kowalski testified that Burgos had knowledge of the conspiracy and did not see wrapping materials on board the train, a rational juror could infer that Burgos touched the plastic bag while it contained crack and that he assisted in the packaging before the men boarded the train in New York. Id. at 25-26. The majority then rhetorically asks, "How else could Burgos's fingerprint be found on an item inside a wrapped package that was wrapped since the inception of the trip from New York?" Id. at 26 (emphasis in original).

Obviously, I agree with the majority to the extent that it is implausible to think that Gobern put the cocaine base in the plastic bag during the one or two minutes he spent in the restroom. Moreover, even

_____

[7] Compare Stoppelli v. United States, 183 F.2d 391, 393, 394 n.4 (9th Cir.) (defendant's fingerprint was found on envelope containing heroin; expert testified that in his opinion defendant's fingerprint was impressed at a time when the envelope contained a powdery substance), cert. denied, 340 U.S. 864 (1950).

68

if I were to disagree with the majority on this point, the jury could certainly infer that one or two minutes is too little time. Where, however, I do disagree with the majority is on its contention that the evidence and reasonable inferences show that Burgos must have assisted in the packaging of the crack cocaine prior to boarding the train in New York. A rational juror would disagree on this too.

It is axiomatic that when a defendant challenges his conviction on sufficiency of the evidence grounds, we must take the facts in the light most favorable to the Government, and we must further draw all reasonable inferences in favor of the Government. That standard of review is not, however, a license to state an inference as a fact and to pile one inference on top of another until the conclusion reached is far removed from the actual facts presented. But that is what the majority has done here.

In particular, I do not dispute that the jury could infer that Burgos touched the bag when it contained cocaine if there was evidence that the cocaine was in the wrapped package throughout the entire trip from New York. There is, however, no such evidence. While Agent Kowalski testified that Burgos said that Gobern possessed the package throughout the trip down from New York, Agent Kowalski never testified that Burgos said that the plastic bag containing the cocaine was inside the wrapped package throughout the entire trip. Gobern may have carried a wrapped package all the way from New York. He may also have carried the crack all the way from New York. Still there is no evidence that Gobern carried the plastic bag inside the wrapped package "since the inception of the trip from New York[.]" Accordingly, there is no evidence to support the majority's assertion that Burgos assisted in the packaging of the cocaine. Gobern was on the train for twelve hours, so he did not have just one or two minutes to put the cocaine in the plastic bag, he had half a day.

Indeed, the fact that Burgos testified that he did not see any materials with which Gobern could wrap or rewrap the package aboard the train does not mean that Gobern did not wrap or open and close the package during the half day he spent on the train. Any child that has ever looked at presents under a Christmas tree before Christmas morning knows that packages can be opened and closed without the aid of scissors, wrapping paper, or tape. Here, there are several differ-

69

ent reasons why Gobern may have handled and packaged or repackaged the crack cocaine during the train trip from New York.

The majority is also wrong when it says that:

> To accept Burgos's rendition of the testimony, the jury would have had to find that Gobern saved the plastic bag, entered the lavatory, tore open the Christmas package and the cereal box, unwrapped the newspaper and aluminum foil from the cocaine base, placed the cocaine base in the plastic bag without leaving his fingerprint, wrapped the plastic bag in aluminum foil, swaddled the aluminum foil in the newspaper, and secreted the cocaine base behind the commode.

Ante at 27. This is simply not true. Once again, Agent Kowalski never testified that Burgos said that he (Burgos) knew cocaine base was in the Christmas package that Gobern possessed from the commencement of the trip in New York. Therefore, although a juror would be free to believe Agent Kowalski's testimony and disbelieve Burgos's testimony in its entirety (which I assume that Burgos's jurors did), a rational juror would still have no basis to conclude that the plastic baggie with Burgos's fingerprint on it was placed in the wrapped package prior to the time that the men left New York.

Nonetheless, could a reasonable juror still infer (and believe it true beyond a reasonable doubt) that Burgos must have assisted in the packaging of the cocaine prior to boarding the train in New York? I think not. Because there was no testimony from Agent Kowalski (or anyone else) that the cocaine was in the wrapped package throughout the entire trip from New York, there is no evidence that Gobern did not put the cocaine into an empty plastic bag bearing Burgos's fingerprint during the twelve hour train ride from New York. Indeed, all a rational juror could know and infer based on the evidence presented here is that the plastic baggie was placed inside the wrapped package at some unknown time before Gobern got off the train.

Furthermore, suppose that I am wrong and that a rational juror could reasonably infer that Burgos did in fact touch or hold Gobern's crack-filled bag at some point before the men boarded the train (or

70

during the train trip itself).**8** How does a juror jump from the finger-print to a conclusion that Burgos wilfully joined and participated in the Gobern/Gonzales conspiracy with the intent to further and accom-plish its criminal purpose? Although a juror could speculate that one who simply touched another's container of drugs had the intent to join in and associate himself with an endeavor to possess and ultimately distribute those drugs, I do not think this would qualify as a rational inference. "Unquestionably the print raises a suspicion. But a suspi-cion, even a strong one, is not enough." Hiet v. United States, 365 F.2d 504, 505 (D.C. Cir. 1966). I therefore think it clear that Burgos's conviction cannot be sustained based on the fingerprint evidence.**9**

2.

The question, of course, remains whether the Government's other evidence somehow bridges the gap between the fingerprint and Bur-gos's alleged intent to participate in the Gobern/Gonzales conspiracy. Viewed in the light most favorable to the Government, the other evi-dence showed the following: Burgos, Gonzales, and Gobern were all from New York; Burgos was acquainted with Gonzales in New York prior to the train ride; Burgos sat near Gobern and Gonzales on the

_____

**8** Again, the Government's fingerprint expert testified he had no idea how long Burgos's fingerprint was on the bag. See United States v. Townley, 942 F.2d 1324, 1326 (8th Cir. 1991) ("There is no evidence when or where the fingerprints [on tape wrapping a bar of cocaine] were made. The police fingerprint expert testified that fingerprints `can last for a long time'; `[i]t's possible' `even as long as a year.'").

**9** My analysis here is consistent with our circuit's fingerprint cases (i.e., sufficiency of the evidence cases where fingerprint evidence was alleged to be determinative) upon which both parties rely in their briefs. I read those cases to say that, if the fingerprint was impressed on a readily mov-able object, and if the Government failed to show that the print could have been impressed only during the commission of the crime charged, then the Government must point to additional substantive evidence (beyond the fingerprint) to sustain the conviction. See United States v. Anderson, 611 F.2d 504, 508-09 (4th Cir. 1979) (reconciling the follow-ing cases: United States v. Harris, 530 F.2d 576 (4th Cir. 1976); United States v. Van Fossen, 460 F.2d 38 (4th Cir. 1972); United States v. Bryant, 454 F.2d 248 (4th Cir. 1972); United States v. Corso, 439 F.2d 956 (4th Cir. 1971)).

71

train ride; Burgos and Gonzales exchanged telephone numbers; Burgos was told they had drugs; the three men got off the train one after the other; and the three men were seen getting into a cab together when the police arrested Gobern.**10**

That being said, not a single witness testified that Burgos had ever met Gobern before the train ride. Also, while Burgos said he was acquainted with Gonzales in New York, no evidence was presented on the scope of their relationship, save for the fact that Burgos and Gonzales exchanged telephone numbers while on the train--a fact that shows that Burgos had hardly any relationship with Gonzales, much less a conspiratorial one.

Likewise, the Government presented no witnesses from New York or the train ride. The Government presented no evidence to show that Burgos had planned to travel to Greensboro with Gobern and Gonzales. There was no evidence that Burgos had previously engaged in any drug activity with Gobern and Gonzales or anyone else. And, as stated above, Burgos was not found to be in possession of any drugs, any weapon, any large amount of cash, or any other items that might indicate an involvement with drugs or the other two men.

Indeed, evidence that Burgos traveled on the same train with Gobern and Gonzales, while going far to show that Burgos associated with Gobern and Gonzales, does little to show that Burgos knowingly and wilfully participated in a Gobern/Gonzales drug conspiracy. See Bell, 954 F.2d at 237 ("More than mere association with bad people who are committing crimes is required for a conspiracy conviction.").

_____

**10** Officer Blanks's testimony about the cab was inconsistent with Officer Piner's later testimony (Officer Kaplan said nothing about a cab). Blanks said that when he and Kaplan came out of the bathroom with the cocaine, Burgos, Gonzales, and Gobern were getting into a cab together (notwithstanding that Piner was asked to keep an eye on the three men). According to Piner, however, when Kaplan and Blanks came out of the bathroom with the crack, Gonzales and Gobern were standing on the sidewalk near a pay phone, at which point Gobern was arrested. (Burgos testified that he went to open the door of the cab but stepped back to the curb when Piner told him he could not leave.) Of course, the jury could have believed Officer Blanks and disbelieved Officer Piner and Burgos.

72

See also Giunta, 925 F.2d at 764 ("[C]ircumstantial evidence that proves nothing more than association between two persons, even if one has a fixed intent known to the other to commit an unlawful act, is not sufficient to permit the inference of the requisite agreement between the two to act in concert to commit the act.") (citations omitted).

Nevertheless, to buttress its conclusion that Burgos participated in a Gobern/Gonzales conspiracy, the majority attempts to distill a number of discrete facts and inferences from the single fact that Burgos, Gobern, and Gonzales traveled on the same train. For example, the majority evidently believes that persons traveling from "source cities," such as New York City, are more likely to be drug conspirators; and, according to the majority, traveling from such a city is affirmative evidence of guilt. Ante at 30-31. While I might agree that traveling from a "source city" is a fact that has bearing on whether law enforcement officials have a "reasonable suspicion" that drugs are being smuggled, I fail to see how our Fourth Amendment jurisprudence bears on the question of whether sufficient evidence was presented showing that Burgos (or anyone else traveling from New York City) knowingly and wilfully participated in a drug conspiracy.

Similarly, that Burgos picked up Gobern's and Gonzales's train tickets, that Burgos knew Gonzales, that Burgos, Gonzales, and Gobern were from the same neighborhood in New York, that Burgos and Gobern exchanged telephone numbers, and that the three appeared to be leaving the train station in a cab together are all "facts" that the majority believes help prove Burgos's guilt. Ante at 31-32. Yet, these are facts that when taken together (or separately) are innocent on their face. They provide little, if any, evidence that Burgos participated in a drug conspiracy.

In addition, while Burgos, Gobern, and Gonzales were on the same train from New York City, there is no evidence showing that Burgos scheduled the same return trip with Gobern and Gonzales, that Burgos lied to Agent Kowalski when he said he was not traveling with Gobern and Gonzales, or that Burgos remained seated near Gobern and Gonzales because they were his co-conspirators. See ante at 30-31 & n.8, 31. Also, while Gobern and Gonzales possessed sequentially numbered train tickets, both in the name of "Anthony Flores," Bur-

73

gos's ticket was in his own name and evidently not in sequential order with the tickets of Gobern and Gonzales. Indeed, even when taken in the light most favorable to the Government, these facts undercut, rather than support, the majority's conclusion that Burgos participated in a drug conspiracy. See Giunta, 925 F.2d at 768 (considering evidence, presented by the Government, that had the effect of undercutting rather than supporting the Government's case when deciding that insufficient evidence was presented on drug conspiracy charge).

Could then the association evidence and the fingerprint evidence, taken together, lead a juror rationally to conclude beyond a reasonable doubt that Burgos wilfully participated in, and intended to further and accomplish the purpose of, the Gobern/Gonzales conspiracy? Again, I think not. If the fact that a defendant merely associates with a drug dealer is insufficient to prove a conspiracy, I doubt the evidence would suddenly be propelled into the realm of sufficiency by the additional fact that the defendant at one time touched the container that stored the dealer's drugs (especially when the Government has not shown that the defendant touched the container while it contained the drugs).

The Ninth Circuit's decision in United States v. Vasquez-Chan, 978 F.2d 546 (9th Cir. 1992), is on point. In that case, DEA Agents infiltrated a drug ring and identified several persons who were suspected of participating in drug trafficking. Eventually, the DEA seized over six hundred kilograms of cocaine found in a house in which the defendants were temporarily residing. One defendant, Vasquez, was the housekeeper, and the other defendant, Gaxiola, was a houseguest. Neither defendant had been mentioned by the co-conspirators as having participated in the drug ring. However, when the DEA agents arrived at the house both defendants were present. Id. at 549.

Both Vasquez and Gaxiola, like Burgos, agreed to speak with the law enforcement officials. Vasquez admitted that she had resided in the house for three months. She said that she worked as a caretaker for a man named Peralta and was paid between $300 and $800 every fifteen days; the money arrived by messenger. According to Vasquez, she did not lease or rent the residence, although agents found a utility bill in her name and the name of Peralta. Vasquez also told the officers that the cocaine had been delivered by messengers about three

74

days earlier, although she could not describe them to the police. In addition, Vasquez possessed a false passport. Id.

As for Gaxiola, she told the agents that she had been Vasquez's roommate in Mexico and that she and her infant child had been visiting Vasquez and staying at the house for a few weeks. The vast majority of the cocaine was found in the bedroom where Gaxiola and her child slept. Twelve of Gaxiola's fingerprints were found on the containers in which the cocaine was stored. While no fingerprints were found on the plastic bags inside of the containers, one of Gaxiola's fingerprints was found on the inside surface of the cover for a container housing the cocaine. Id.

Both Vasquez and Gaxiola were indicted and convicted by a jury of conspiracy to possess cocaine with intent to distribute, possession, and aiding and abetting. On appeal they claimed that the evidence was insufficient on all counts. The Ninth Circuit reversed the convictions. On the conspiracy charge, the court held:

> While the government submitted more than enough evidence that a narcotics conspiracy existed among several defendants other that Gaxiola and Vasquez, the evidence does not establish that the defendants here agreed to or knowingly assisted that conspiracy. Gaxiola's and Vasquez's actions are consistent with those of an innocent housekeeper and houseguest who have no involvement in the ongoing narcotics transaction . . . .

Id. at 553 (emphasis in original).

As for the fingerprint evidence against Gaxiola, the court said:

> The canisters--some opened, some closed, some empty, some filled with cocaine--were located in her bedroom; it is reasonable to assume that she touched them at some time, including on one occasion the inside lid of a canister, as she passed in and out of the room or made space in the small bedroom so that she and her infant child could have a comfortable place to sleep. The evidence presented at Gaxiola's

75

trial did not establish any reason to believe that an innocent explanation of that evidence was any less likely than the incriminating explanation advanced by the government . . . . Even when the fingerprint evidence is combined with the other evidence against Gaxiola, it is legally insufficient to establish in the mind of a reasonable juror, <u>beyond a reasonable doubt</u>, that she possessed the cocaine located in the house in which she was staying.

<u>Id.</u> at 551-52 (emphasis in original).

Needless to say, the evidence presented against Burgos is no more damning (and actually far less so) than the evidence presented against Vasquez and Gaxiola.

3.

There remains the question whether in reviewing the sufficiency of the evidence on appellate review, can we affirm by assuming that the jury converted its apparent disbelief of Burgos's testimony into positive evidence of guilt. In other words, can we, as the majority has done, <u>see ante</u> at 25, 28-31, fill in the factual gaps in the Government's proof by negative inference grounded on the assumption that the jury disbelieved Burgos and believed Agent Kowalski's account of what Burgos said to him about Gobern and Gonzales? Specifically, if the majority is correct, Burgos's participation in the conspiracy can be established by demeanor evidence arising from Burgos's denial that he told Agent Kowalski that Gobern and Gonzales were involved in drug trafficking.

Although this circuit has not squarely addressed the issue of what inferences are permissible from disbelief, we have (before today) indicated that the Government cannot prove its case by negative inferences based on demeanor evidence. <u>See United States v. Fountain</u>, 993 F.2d 1136, 1139 (4th Cir. 1993) ("while [the defendant's] evidence may be disbelieved, it contained nothing which, through disbelief, could be converted to positive proof of distribution of marijuana by him"). I would take this opportunity to adopt the longstanding view that demeanor evidence (<u>i.e.</u>, evidence inferred from the assumption that the jury disbelieved the defendant's testimony) does

76

not allow us on appellate review to fill the evidentiary gaps in the Government's case. See Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952) (Hand, J.). See generally Olin Guy Wellborn, III, Demeanor, 76 Cornell L. Rev. 1075, 1101-02 (1991) ("Hundreds of cases say . . . [m]ere disbelief of testimony is not proof of facts of an opposite nature or tendency.").

When, as here, there is a conviction and the jury made credibility determinations based on the defendant's testimony and conflicting testimony from the Government, the only affirmative evidence of guilt we may assume on appellate review is attributable to the testimony offered by the Government. There is, of course, nothing remarkable about this standard. It is black letter law that we must assume that the jury credited the Government's evidence, and we must accept such evidence as true for purposes of deciding whether sufficient evidence of guilt was presented at trial.

I think it clear, however, that we may not assume more than this. If we did, then appellate review would be rendered meaningless because there is no basis (except speculation) to decide what additional evidence the jury inferred in light of its credibility determinations. Indeed, to hold that the Government can be credited with additional affirmative evidence of guilt based on negative credibility determinations made against the defendant would relieve the Government of the burden of proving its case. It would raise the problem discussed by Judge Learned Hand in Dyer v. MacDougall, 201 F.2d 265 (2d Cir. 1952), and allow the Government to prove its case by having us assume that which is at issue: whether "there is substantial evidence, taking the view most favorable to the Government, to support [the jury's verdict]." Glasser v. United States, 315 U.S. 60, 80 (1942).

In Dyer, an action for libel and slander, the plaintiff proposed to call the defendants to the stand, have them deny uttering the slander, and then rely upon the jury to disbelieve the witnesses, thus proving the plaintiff's case. Judge Hand rejected the argument that such "demeanor" evidence would be sufficient to prove the plaintiff's case. Judge Hand explained that while a witness's demeanor "is part of the evidence" and that the jury "may and indeed they should" take it into consideration, to allow one party to prove its case based on negative inferences would render appellate review meaningless:

77

He, who has seen and heard the "demeanor" evidence, may have been right or wrong in thinking that it gave rational support to a verdict; yet, since that evidence has disappeared, it will be impossible for an appellate court to say which he was. Thus, he would become the final arbiter in all cases where the evidence of witnesses presented in court might be determinative.

201 F.2d at 269. See United States v. Zeigler, 994 F.2d 845, 850 (D.C. Cir. 1993) ("There is no principled way of deciding when the government's proof, less than enough to sustain the conviction, is nevertheless enough to allow adding negative inferences from the defendant's testimony to fill the gaps."); United States v. Sliker, 751 F.2d 477, 495 n.11 (2d Cir. 1984) ("Although [demeanor] is a legitimate factor for the jury to consider, this could not remedy a deficiency in the Government's proof if one existed."), cert. denied, 470 U.S. 1058 (1985).

Accordingly, Burgos's jury was free to believe Agent Kowalski's testimony as to Burgos's alleged admissions, and we must accept that the jury believed to be true everything that Agent Kowalski said. Likewise, to the extent that Burgos denied making the statements to Agent Kowalski, we must accept that the jury disbelieved Burgos. Yet, where the testimony of Agent Kowalski is not in conflict with the testimony of Burgos, such as on the critical question of whether Burgos participated in a Gobern/Gonzales conspiracy, we are still not free to fill in the gaps in the Government's proof by considering Burgos's denial that he was a part of that alleged conspiracy as affirmative evidence of guilt.[11]

_____

[11] Agent Kowalski was not on the train with Burgos, Gobern, and Gonzales; thus, Agent Kowalski could not and did not provide any evidence independent of Burgos's alleged admissions as to what transpired. In light of this, the majority's reliance on the Eleventh Circuit's decision in United States v. Hastamorir, 881 F.2d 1551 (11th Cir. 1989), is misplaced. See ante at 23. In Hastamorir, customs officers observed six suspected drug traffickers conversing at a mall restaurant. Three of the individuals then left the restaurant for the mall parking lot and proceeded to exchange thirty kilograms of cocaine. These individuals were then arrested. Unaware of the arrests, the three other individuals at the restaurant then left, also for the mall parking lot where they too were arrested.

78

Finally, in making the sufficiency determination, I have not given any credit to Burgos's innocent explanations. Nor have I required the Government to disprove all innocent hypotheses. The law is clear that the Government need not exclude every reasonable hypothesis consistent with innocence. Holland v. United States, 348 U.S. 121, 139-40 (1954) (rejecting the view that where the Government relies on cir-

_____

Defendant Ledezma (whom the majority likens to Burgos) was in the second group of three. At the time of his arrest and at trial, he flatly denied knowing any of the three individuals who had been previously arrested--a fact that was clearly a lie in light of the customs officer's prior observations. 881 F.2d at 1554. Ledezma's fingerprints were also found on packages wrapping two kilograms of cocaine. Id. at 1555. At trial Ledezma was convicted of conspiracy to possess cocaine with intent to distribute. On appeal the Eleventh Circuit affirmed on the ground that "Ledezma's false testimony that he was not at[the restaurant] entitled the jury to reasonably infer that he was aware of and participated in criminal activity at the mall." Id. That is, the jury could infer affirmative evidence of guilt based on testimony shown to be perjured by direct eyewitness evidence to the contrary, not demeanor evidence and negative credibility determinations made against the defendant.

In the present case, the majority makes great attempts to show that Burgos (like defendant Ledezma in Hastamorir) fabricated parts of his testimony at trial. See ante at 24-25. However, Burgos's alleged fabrications are based on the inference that the jury credited Agent Kowalski's testimony as to Burgos's alleged admissions, not evidence independent of Agent Kowalski's testimony that proves that Burgos lied at the time of his questioning or perjured himself on the stand. I agree that there are certainly inconsistencies between Burgos's alleged admissions made to Agent Kowalski and his testimony at trial, but those inconsistencies are based on inferences derived from demeanor evidence and negative credibility determinations made against Burgos. On appellate review, they are insufficient to fill the gaps in the Government's case. Cf. Wright v. West, 505 U.S. 277, 296 (1992) (cited by the majority, ante at 28-30) (jury may consider perjured testimony as affirmative evidence of guilt); United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988) (cited by the majority, ante at 29-30) (defendants' admissions to the police and testimony on the stand were viewed as affirmative evidence of guilt when such admissions and testimony were shown to be false by direct eyewitness evidence to the contrary--not credibility determinations based on conflicting testimony).

cumstantial evidence, it must "exclude every reasonable hypothesis other than that of guilt"); see Jackson v. Virginia, 443 U.S. 307, 326 (1979) (habeas case confirming that the Government has no "affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"). "The question is not whether the evidence forecloses all possibility of doubt in the mind of the court, but merely whether the evidence, construed most favorably for the prosecution, is such that a jury might find the defendant guilty beyond a reasonable doubt." Crawley v. United States, 268 F.2d 808, 811-12 (4th Cir. 1959).

What we have here is a case where the Government urges inference upon inference, not all of which are rational or supported by the record. The Supreme Court advised long ago that "charges of conspiracy are not to be made out by piling inference upon inference," Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943), and we too have warned that, although a jury may infer a conspiratorial relationship, "[s]uch inferential analysis is not boundless," Bell, 954 F.2d at 236. Viewed in the light most favorable to the Government, the evidence here was insufficient for a rational juror to conclude to a "near certitude," Jackson, 443 U.S. at 315, that Burgos wilfully participated in the Gobern/Gonzales conspiracy. Consequently, the evidence was insufficient as a matter of law to sustain Burgos's conspiracy conviction.

B.

From what I have said thus far, it would appear evident that Gobern's conspiracy conviction must be sustained. Indeed, at Burgos's trial, the testimony of Agent Kowalski as to Burgos's alleged admissions provided sufficient evidence to establish the existence of a Gobern/Gonzales conspiracy. At Gobern's trial, however, Agent Kowalski did not testify as to Burgos's alleged admissions. Therefore, unlike at Burgos's trial, the Government not only had to present evidence that Gobern knowingly and wilfully participated in a conspiracy to possess crack cocaine with intent to distribute (i.e., evidence of a "slight connection" to an established conspiracy), but the Government also had to present substantial evidence to the jury showing the existence of a conspiratorial agreement to possess crack cocaine with

80

intent to distribute. <u>See</u>, <u>e.g.</u>, <u>Bell</u>, 954 F.2d at 137-38; <u>Giunta</u>, 925 F.2d at 764; <u>Laughman</u>, 618 F.2d at 1074.

In its analysis the majority never directly acknowledges the fact that Agent Kowalski did not testify as to Burgos's alleged admissions at Gobern's trial. Nor, for that matter, does the majority state what evidence presented at Gobern's trial shows that Gobern had a specific agreement with either Gonzales, Burgos, or both to possess crack cocaine with intent to distribute. Because the evidence presented about Burgos at Gobern's trial was even less than that presented at Burgos's own trial, there is, of course, insufficient evidence in the Gobern record upon which to find a conspiratorial agreement between Gobern and Burgos.

I believe, however, that even without Agent Kowalski's testimony, there is still sufficient evidence upon which to find a conspiratorial agreement between Gobern and Gonzales, and I would, therefore, sustain Gobern's conspiracy conviction on that ground. Gobern's jury was presented with evidence in the form of the sequentially numbered train tickets that showed that Gobern and Gonzales were traveling together under an alias and planned to return to New York City together within two days. The jury was also presented with evidence that Gobern and Gonzales denied knowing each other when questioned by the police, an obvious attempt to cover up their relationship. And, without doubt, the evidence presented to the jury showed that Gobern possessed the crack cocaine. From this evidence I believe that a rational juror could find that there existed a conspiratorial agreement between Gobern and Gonzales to possess and distribute the drugs that Gobern carried.

Of course, none of these facts implicate Burgos in any way. Rather, they undercut any showing of his guilt. That is, there was no evidence presented showing that Burgos was traveling under an alias (the evidence was actually to the contrary), had a return trip scheduled with Gobern and Gonzales, or lied to the police about knowing Gobern and Gonzales. Nonetheless, based on the fingerprint evidence the majority again erroneously concludes that "[t]he fact that Burgos's fingerprint was on an <u>interior</u> article wrapped in a package held by Gobern from the inception of the train trip could demonstrate to a rational finder of fact that Burgos and Gobern conspired to distribute the cocaine

81

base." <u>Ante</u> at 37 (emphasis in original). However, the majority does not explain what evidence shows that Gobern possessed cocaine in an "interior article" (<u>i.e.,</u> the baggie) of the wrapped package from the inception of the train trip. The reason for this is quite simple. There is <u>no</u> such evidence.**12**

III.

The evidence fares no better on Count Two of the indictment returned against Burgos, which charged both possession of cocaine base with intent to distribute, in violation of 21 U.S.C. § 841, and aiding and abetting the possession with intent to distribute, in violation of 18 U.S.C. § 2.

_____

**12** To cast Burgos as part of the Gobern/Gonzales conspiracy, the majority also emphasizes that Gobern, Gonzales, and Burgos appeared to separate when disembarking the train, regrouped at the taxi stand, and were traveling from a "source city." <u>Ante</u> at 35-36. As I have explained, however, these acts fall well short of establishing that Burgos knowingly and wilfully participated in a Gobern/Gonzales conspiracy, much less do they establish a specific agreement between Gobern, Gonzales, <u>and</u> Burgos to possess crack cocaine with intent to distribute.

In addition, the majority's conclusion that the act of watching another person be questioned by the police is "countersurveillance" amounting to evidence of guilt is especially wrongheaded. <u>See ante</u> 36. Perhaps if one defendant acts as a "lookout" for a drug purchase, we might have a different situation. <u>See United States v. Pazos</u>, 993 F.2d 136, 140 (7th Cir. 1993) (cited by the majority, <u>ante</u> at 36) (sufficient evidence established defendant as part of conspiracy based on act of countersurveillance when, among other things, defendant, armed with a loaded weapon, arrived with alleged co-conspirator at location of prearranged drug transaction, made initial contact with Government informant, and remained in parking lot during the deal's negotiations, visually surveying the area generally and closely scrutinizing automobile in which transaction was negotiated). I believe, however, that standing in plain sight to observe the questioning of a fellow passenger hardly amounts to surveillance, much less countersurveillance. At most this is a case of rubbernecking. And, of course, while Gobern observed the police questioning Gonzales, there was no evidence presented showing that Gobern countersurveilled the questioning of Burgos.

82

As for the possession charge, while the Government need not establish that the defendant actually possessed drugs, the Government must show "constructive possession, which occurs when the defendant `exercises, or has power to exercise, dominion and control over the item.'" United States v. Samad, 754 F.2d 1091, 1096 (4th Cir. 1984) (quoting Laughman, 618 F.2d at 1077). Also, our circuit has said that "[a]n individual may possess drugs jointly with another, but mere presence on the premises where drugs are found, or association with one who possesses drugs, is insufficient to establish the possession needed for a conviction under 21 U.S.C. § 841(a)." Samad, 754 F.2d at 1096; accord United States v. Rusher, 966 F.2d 868, 878 (4th Cir.), cert. denied, 506 U.S. 926 (1992). Thus, a rational juror could not find Burgos guilty of possession beyond a reasonable doubt merely because he associated with Gonzales and Gobern and knew that they had drugs to distribute. And despite the majority's conclusion to the contrary, ante at 44, the fingerprint does not rescue the Government's case.

The Government's argument is that the jury could infer that Burgos touched the bag when it contained cocaine. But how does the jury get to ownership, dominion, or control on January 25, 1993, from this evidence of prior touching? The Government's argument suggests a juror could rationally infer that if a defendant at one time touched an object serving as a container for drugs, the defendant has the power to exercise ownership, dominion, or control over those drugs. The Government argues that the inference is rational here even though (1) the container was not found on Burgos or at his premises, (2) there was evidence the drugs belonged to someone else, (3) there was no evidence of any prior drug activity by Burgos, and (4) Burgos was not found in possession of any drugs or weapons or an unusually large amount of cash. I believe, however, that the Government has failed to prove its case. See United States v. Vasquez-Chan, 978 F.2d 546, 550-53 (9th Cir. 1992).

A conclusion that Burgos had ownership, dominion, or control over the contents of the container "requires bridging an evidentiary gap with rank speculation," Goldsmith v. Witkowski, 981 F.2d 697, 703 (4th Cir. 1992), cert. denied, 509 U.S. 913 (1993). Consequently, the evidence was not sufficient to show that Burgos had constructive possession of the crack ultimately seized from the train station bathroom.

83

Thus, it was insufficient to sustain Burgos's conviction for possession with intent to distribute as charged in Count Two of the indictment.**13**

As for the aiding and abetting charge, the Government's brief on appeal makes no argument on how or why the evidence was sufficient to support that charge. The only mention of it in the Government's brief is this unenlightening sentence: "Aiding and abetting was charged in connection with the possession with intent to distribute." Govt. Br. at 10. The majority does not do much better and summarily concludes that because the evidence was sufficient to sustain Burgos's conspiracy conviction, it is sufficient to sustain the aiding and abetting conviction. Ante at 44. I disagree.

To establish aiding and abetting, the Government had to prove beyond a reasonable doubt that Burgos became associated with and participated in Gobern's possession of "crack" cocaine and that Bur-

_____

**13** Cf. United States v. Lucas, 67 F.3d 956 (D.C. Cir. 1995) (reversing conviction for possession of narcotics where defendant sublet apartment in which drugs were found, a receipt with the defendant's name was found in the apartment, and the defendant's fingerprints were found on a shoe box containing drugs); United States v. Earl, 27 F.3d 423 (9th Cir. 1994) (per curiam) (DEA agents found defendant inside residence that contained drugs, drug paraphernalia and weapons, and an informant testified that defendant stayed there and "conducted crime" there; the court found this evidence to be insufficient to show constructive possession, and the evidence was not made sufficient by the additional fact that defendant's fingerprints were found on a plate (in the residence) that may have contained traces of cocaine).

In United States v. Van Fossen, 460 F.2d 38, 41 (4th Cir. 1972), we left undecided whether the defendant "possessed" certain engraving plates and photographic negatives used in counterfeiting despite the fact that his fingerprints were found on the illegal items. In other words, the fact that the defendant at one time touched the items did not necessarily mean he had ownership, dominion, or control over them. Of course, Burgos's fingerprint was not impressed on the illegal item here (the crack) but rather on that item's container, a plastic bag. Cf. United States v. Keeper, 977 F.2d 1238, 1241 (8th Cir. 1992) (in dicta court said defendant's fingerprint on a plastic bag containing a large amount of cocaine, by itself, would not be enough to show possession of the cocaine beyond a reasonable doubt).

gos acted with the specific intent to facilitate that crime and the desire to make it succeed. <u>United States v. Poston</u>, 902 F.2d 90, 93 (D.C. Cir. 1990); <u>see Flowers v. Tandy Corp.</u>, 773 F.2d 585, 590 (4th Cir. 1985) (noting that, in criminal context, a defendant may be found guilty of aiding and abetting if he "shared in the principal's criminal intent"); <u>United States v. Winstead</u>, 708 F.2d 925, 927 (4th Cir. 1983).

Here, viewed in the light most favorable to the Government, the evidence was insufficient for a rational juror to conclude beyond a reasonable doubt that Burgos assisted Gobern's criminal activity with the intent to facilitate it and the desire to make it succeed. The finger-print and the associational evidence is simply not that strong.[14] Accordingly, the aiding and abetting charge does not salvage Burgos's conviction on Count Two.

\* \* \*

Again, I respectfully dissent from the majority's affirmance of Burgos's conviction.

Judge Hall, Judge Murnaghan, Judge Ervin, and Judge Motz join in this opinion.

_____

[14] I am not saying that because the evidence was insufficient on the conspiracy count, it necessarily was insufficient to sustain the aiding and abetting charge. The elements of the crime of conspiracy differ from those required to show aiding and abetting, and evidence may be insufficient to sustain the former yet sufficient to sustain the latter. <u>See United States v. Arrington</u>, 719 F.2d 701, 705-06 (4th Cir. 1983), <u>cert. denied</u>, 465 U.S. 1028 (1984). In this case, however, the evidence was insufficient to show either that Burgos knowingly and wilfully participated in the conspiracy or that he aided and abetted Gobern's possession with intent to distribute.

85